```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                        WACO DIVISION

 3  WSOU INVESTMENTS LLC          *   October 21, 2020
                                  *
 4  VS.                           *   CIVIL ACTION NOS.
                                  *
 5  DELL TECHNOLOGIES INC. ET AL  *   W-20-CV-473 thru 482, 485, 486

 6                BEFORE THE HONORABLE ALAN D ALBRIGHT
                  TELEPHONIC SCHEDULING CONFERENCE
 7
    APPEARANCES:
 8
    For the Plaintiff:        James L. Etheridge, Esq.
 9                            Ryan Scott Loveless, Esq.
                              Travis Lee Richins, Esq.
10                            Etheridge Law Group, PLLC
                              2600 E. Southlake Blvd., Suite 120-324
11                            Southlake, TX 76092

12                            Mark D. Siegmund, Esq.
                              Law Firm of Walt Fair, PLLC
13                            1508 N. Valley Mills Drive
                              Waco, TX 76710
14
    For the Defendant:        Barry K. Shelton, Esq.
15                            Shelton Coburn LLP
                              311 RR 620 S, Suite 205
16                            Austin, TX 78734-4775

17                            Benjamin Hershkowitz, Esq.
                              Brian Rosenthal, Esq.
18                            Gibson, Dunn & Crutcher LLP
                              200 Park Ave.
19                            New York, NY 10166

20  Court Reporter:           Kristie M. Davis, CRR, RMR
                              PO Box 20994
21                            Waco, Texas 76702-0994
                              (254) 340-6114
22

23       Proceedings recorded by mechanical stenography, transcript

12:58  24  produced by computer-aided transcription.

01:31  25
```

01:31  1          (October 21, 2020, 1:31 p.m.)

01:31  2          MS. WALLACE:  Court calls Waco Case 20-CV-473, 474, 475,

01:31  3   476, 477, 478, 479, 480, 481, 482, 485 and 486, WSOU

01:31  4   Investments versus Dell Technologies Inc., et al for scheduling

01:31  5   conference.

01:31  6          THE COURT:  If I could hear announcements from counsel,

01:31  7   please.

01:31  8          MR. SIEGMUND:  Good afternoon, Your Honor.  This is Mark

01:31  9   Siegmund for plaintiff WSOU, and with me today I have Mr. Jim

01:31  10  Etheridge from the Etheridge Law Group, Ryan Loveless and

01:32  11  Travis Richins all from the Etheridge Law Group.

01:32  12         THE COURT:  And who will be speaking?

01:32  13         MR. SIEGMUND:  Myself and Jim, Your Honor.

01:32  14         THE COURT:  Okay.  Good to hear from you.

01:32  15         And for defendants?

01:32  16         MR. SHELTON:  Good afternoon, Your Honor.  This is Barry

01:32  17  Shelton of Shelton Coburn LLP.  Today we have two client

01:32  18  representatives.  First is David Kuznick from Dell Technologies

01:32  19  and Danielle Coleman from VMware, and speaking today for the

01:32  20  defendants will be Brian Rosenthal from Gibson Dunn, and also

01:32  21  here today is Benjamin Hershkowitz from Gibson Dunn.

01:32  22         THE COURT:  Very good.  Well, I always try to welcome

01:32  23  folks who are either in-house or clients who have taken the

01:32  24  time to attend.  I very much appreciate it.

01:32  25         So I'm happy to take up whatever the issues are.

01:32  1        MR. ETHERIDGE:  Well, Your Honor, this is Jim Etheridge

01:32  2   speaking for WSOU.  Maybe the first one to take up is a fairly

01:32  3   easy one.  It relates to foreign discovery.  You might remember

01:33  4   we had a pretty thorough discussion of this at our CMC with

01:33  5   Huawei on Friday, and the result from the Court was that we

01:33  6   would go ahead and start foreign discovery with regard to

01:33  7   inventors and the entities and that the process could start,

01:33  8   although discovery wouldn't start till after the Markman.

01:33  9   After that call we had a meet and confer with Mr. Shelton who

01:33 10   was also on that CMC and inquired if we took the same position,

01:33 11   and we told them that we do.  We're fine with that.  After

01:33 12   that -- afterwards we got more correspondence from him

01:33 13   basically really extending the reach and the scope of that

01:33 14   discovery in addition to just the inventors and the entities

01:33 15   through which the -- you know, the patents had passed, wanted

01:33 16   discovery of inventors from other patents that are not in this

01:33 17   suit.  Dell's position is that that's relevant because they

01:33 18   were incorporated by reference.  He wants discovery of any

01:34 19   foreign firms whose name appears in any of the prosecution that

01:34 20   would be foreign law firms.  He goes deeper and asks for

01:34 21   discovery of any prosecuting attorneys whose names appear in

01:34 22   any of the prosecution file references and then also discovery

01:34 23   of any person that's signed a document in the chain of title,

01:34 24   and that's again separate from, you know, discovery on the

01:34 25   entity, and then finally discovery of all entity names that

4

01:34  1    appear anywhere in the chain of title even if they're not the

01:34  2    signatory parties.

01:34  3         So we stand by the decision last week of the Court that I

01:34  4    think it's fine to start discovery with regard to inventors and

01:34  5    the actual entities who had an ownership in the patents as they

01:34  6    were transferred.  Our concerns are with this broad ranging

01:34  7    discovery is it's just not proportional to the needs of the

01:34  8    case, and subpoenaing law firms and lawyers probably is going

01:35  9    to not result in very much and probably are going to be picking

01:35  10   up work product and privilege objections and taking up the time

01:35  11   of the Court prior to the Markman.

01:35  12        And also just having looked back at what the Court has

01:35  13   permitted before, you know, discovery's always been somewhat

01:35  14   limited.  So I just kind of remind you of the analogy, if you

01:35  15   give a mouse a cookie, then, you know, they continue to ask for

01:35  16   more and more.  It just doesn't seem like there's much to be

01:35  17   found from trying to depose a person who signed a document in

01:35  18   the chain of title because that person might have some

01:35  19   information about the licensing of the patents when none of

01:35  20   that evidence exists, and it seems like a fishing expedition.

01:35  21   So I would suggest we have the same scope and range that we

01:35  22   concluded that the Court permitted in Huawei and that we stop

01:35  23   it there before the discovery gets incredibly expansive.

01:35  24        THE COURT:  I'll hear from defendants.

01:35  25        MR. ROSENTHAL:  Your Honor, it's Brian Rosenthal.  Thank

01:35  1    you.  Good to talk to you today.

01:35  2        Yes.  So just factually I don't think it makes much of a

01:36  3    difference, but we didn't start with a request for assignees

01:36  4    and inventors and then once we got that, asked for more.

01:36  5    That's not at all what happened.  We sent two or three weeks

01:36  6    ago a list of all of the foreign discovery that we wanted to

01:36  7    pursue in this case.  And that included assignees, inventors,

01:36  8    and it included both that have prosecuted the patents and it

01:36  9    included some of the other categories that are -- that Jim just

01:36  10   mentioned a moment ago.

01:36  11       We've always from the beginning of that correspondence

01:36  12   sought all of that.  What happened on Monday when we had our

01:36  13   meet and confer is that we said, look.  We understand that the

01:36  14   Court ruled on Friday that foreign discovery can proceed as far

01:36  15   as the procedures can be begun as long as the discovery itself

01:36  16   does not take place until after the Markman hearing, and so we

01:36  17   assume that you all are okay and that we can proceed on that

01:36  18   basis.  And the response that we got was, well, we're okay with

01:37  19   that with respect to the assignees and the inventors.  We're

01:37  20   not okay with that with respect to the other categories.  We

01:37  21   did not understand that there was any sort of discussion of the

01:37  22   metes and bounds of what would and would not be included in the

01:37  23   foreign discovery on Friday's hearing in the Huawei case.  Mr.

01:37  24   Shelton was on that call.  I was not.  But we understood that

01:37  25   the question was one about timing.  Foreign discovery requests,

| 01:37 | 1 | can they be in fact begun at this point as long as the |

01:37   1   can they be in fact begun at this point as long as the

01:37   2   discovery itself does not take place until after the Markman

01:37   3   hearing.  So I don't see any reasonable distinction or any

01:37   4   meaningful distinction between foreign discovery that we need

01:37   5   to take.  That takes a long time.  It's a lot of countries

01:37   6   we've got to go to.  Whether that discovery is of an assignee

01:37   7   or whether that discovery is of, you know, a former assignee,

01:37   8   one of the companies in the chain.  So from a timing

01:37   9   perspective, our understanding is the whole point of this is

01:38   10  foreign discovery takes a long time.  If we wait until May to

01:38   11  start those requests, there's no chance that we're going to get

01:38   12  that information in time to use it for the trial.  And that's

01:38   13  the reason to start it now.

01:38   14      With respect to the categories of information that we're

01:38   15  looking for, you know, the fact that there are a lot of

01:38   16  different categories of the product of a fact that we've got

01:38   17  12 cases here, each of which are totally different patents in

01:38   18  totally different families, most of the time came from totally

01:38   19  different companies that were acquired by various Alcatel

01:38   20  companies, there's all kinds of different history.  This is not

01:38   21  a straightforward situation where you got two or three patents

01:38   22  that were, you know, developed out of an R&D department in

01:38   23  France and we're just looking to get some information from the

01:38   24  companies from which the development occurred, that's not this

01:38   25  case.  This case is -- and these cases have to do with lots of

01:38  1  different companies that reside in lots of different places

01:39  2  around the world, and these patents have moved around and moved

01:39  3  around several times, and so they were -- you know, Nokia was a

01:39  4  former owner of some of these patents.  There were assignments

01:39  5  that were granted.  There were sales that were granted.  Each

01:39  6  and every one of those transactions has possibilities of having

01:39  7  very important information.  I can't tell you with certainty

01:39  8  what each of those transactions will yield as far as

01:39  9  information, but I think that it's certainly reasonable that we

01:39  10  be permitted to pursue what those transactions look like and

01:39  11  what went into them.  That's the purpose of our discovery with

01:39  12  respect to the former assignee.  The prosecuting attorneys is a

01:39  13  similar situation.  We've got lots of different folks that were

01:39  14  involved in the prosecution.  And so we're interested in taking

01:39  15  discovery from those folks.  And then the inventors, there

01:39  16  are -- there's a patent that incorporates what the '888 patent,

01:39  17  which is one of the 12 cases, incorporates by reference another

01:40  18  patent, and that patent has a number of inventors, and those

01:40  19  inventors clearly invented subject matter very, very similar to

01:40  20  that which is disclosed and claimed in the '888 patent.  And so

01:40  21  it is absolutely targeted.  We're not taking discovery or

01:40  22  seeking to take discovery of every inventor of every patent

01:40  23  that's incorporated by reference by any means.  It's one very

01:40  24  narrow focused set of inventors that we believe that discovery

01:40  25  is likely to yield something important here.  And so from our

8

01:40  1    perspective, it's reasonable, it's targeted, it's related to

01:40  2    the lawsuit, and what we are asking for is just the ability to

01:40  3    start that process now rather than waiting until May.

01:40  4         THE COURT:  Anyone else for any of the defendants?

01:40  5         MR. ROSENTHAL:  I'm certainly happy to have anybody else

01:40  6    speak, but I intended to speak on behalf of both VMware and

01:41  7    Dell.

01:41  8         THE COURT:  Okay.  Very good.

01:41  9         I'll hear from -- any response from the plaintiff, and

01:41  10   including in that response, if I could hear an explanation or

01:41  11   representation of how the additional efforts, if any, by the

01:41  12   defendants to get this stuff started will cause additional

01:41  13   burden on behalf of the plaintiff at this time that wouldn't be

01:41  14   fair.

01:41  15        MR. ETHERIDGE:  Well, a couple of things, Your Honor.

01:41  16   One, again, we're not arguing about the inventors.  Quite a bit

01:41  17   of time that Mr. Rosenthal just spent was talking about

01:41  18   inventors.  That's a given.  And also entities that actually

01:41  19   own the patents.  We're talking about is every single

01:41  20   prosecuting attorney whose name happens to appear on a

01:41  21   prosecution, and that is also discovery from persons that just

01:41  22   sign a document in the chain of title separate from the actual

01:41  23   entity.  And then the last one is just discovery from entity

01:42  24   names that happen to appear in the chain of title that aren't

01:42  25   even signatories.  So I guess what I'm saying is I think as

01:42  1  this stuff comes up, we're going to get into discovery disputes

01:42  2  pre-Markman.  A lot of this stuff is going to be privileged,

01:42  3  attorney work product --

01:42  4      (Clarification by the reporter.)

01:42  5      MR. ETHERIDGE:  I think we're going to get into taking up

01:42  6  the Court's time with motions to quash and disputes about

01:42  7  whether or not something is attorney/client privilege from a

01:42  8  prosecuting attorney, and I don't think we need to get into

01:42  9  those issues until after Markman.

01:42  10     THE COURT:  Well, I don't think -- and maybe I'm missing

01:42  11  it.  I'm just being dense maybe.  I don't think the defendants

01:42  12  are asking to take any of this discovery now.  They're simply

01:42  13  trying to get it arranged so that it may commence as quickly as

01:42  14  possible.  And if I'm misunderstanding it, please let me know.

01:42  15     MR. ETHERIDGE:  Well, a great part of this discovery is in

01:43  16  Canada.  I've never had any problem getting discovery in

01:43  17  Canada, and I guess the practical question is, let's say that

01:43  18  you -- the right to a particular prosecuting firm who's willing

01:43  19  to send them something, are we then putting our hand up and

01:43  20  saying that's okay.  Don't send it until after Markman?  What's

01:43  21  going to stop these people from engaging in letter writing back

01:43  22  and forth and we will get into discovery de facto, and the only

01:43  23  reason this is happening because of kind of the foreign

01:43  24  exception that you have in your court, and I understand that

01:43  25  and we understood your struggles with, you know, Chinese source

01:43   1   code and such, but that's just not the situation here.  And I

01:43   2   guess I'm seeking a little bit more understanding of what that

01:43   3   means there will be no discovery until after Markman.  This is

01:43   4   just writing a letter or a subpoena to somebody in Canada.

01:43   5   Will they be informed -- must they be informed, you do not have

01:43   6   to comply with this until after Markman, or how does that

01:43   7   process -- I don't understand how you -- how we say the process

01:44   8   starts now, but there is no discovery until after Markman.

01:44   9        MR. ROSENTHAL:  Your Honor, may I address that?  It's

01:44   10   Brian Rosenthal.

01:44   11        THE COURT:  Of course.

01:44   12        MR. ROSENTHAL:  I think it's the same answer to that

01:44   13   question as is the answer with respect to assignees and

01:44   14   inventors.  We're talking about a process question here.  And

01:44   15   the process is the same, and we're not just dealing with

01:44   16   Canada.  We're dealing with the Netherlands and Germany and

01:44   17   Finland, France.  There's a lot of different countries.  These

01:44   18   patents came from a lot of different places.

01:44   19        But as far as what is a mechanism that we use to ensure

01:44   20   that the discovery is not taken in advance, that's just

01:44   21   communication.  And, by the way, Canada is not quick right now.

01:44   22   We understand from other matters that things are moving very

01:44   23   slowly due to COVID.  And I don't expect that that's going to

01:44   24   be an easy process.  But the simple answer, we'll just tell

01:45   25   every one of these folks, including the inventors and the

01:45  1  assignees and these other categories of people that have

01:45  2  relevant information that we would like for them to produce the

01:45  3  requested information after April 29th or after April 30th.

01:45  4      THE COURT:  Let me interrupt for a second.  So it seems to

01:45  5  me that plaintiff has two choices here.  And I may be

01:45  6  deferential to them with what -- so it seems to me that

01:45  7  probably what the plaintiff cares a great deal about is me

01:45  8  setting these cases for trial and keeping them on track to get

01:45  9  them tried.  And my sense is that what the defendants are

01:45  10  attempting to do is to get things lined up so that when Markman

01:46  11  takes place and the balloons go up and discovery can commence,

01:46  12  it can commence quickly.  It seems to me that if I restrict

01:46  13  what the defendants want to do in terms of what I'll call that

01:46  14  preliminary gating or preparing for discovery to commence

01:46  15  quickly, it seems to me that if the plaintiffs want me to have

01:46  16  the defendants hold off on that, then the risk should be that

01:46  17  if we delay doing that and we then encounter problems -- the

01:46  18  defendants encounter problems getting discovery that I were to

01:46  19  determine they're entitled to that that would -- that might

01:46  20  require me to extend the period of discovery and push back the

01:47  21  trial.  So when I say I want to be somewhat deferential to the

01:47  22  plaintiff here, I don't mean to sound biased.  I try and keep

01:47  23  everything as even as possible, but it seems to me -- it seems

01:47  24  to me -- well, it absolutely is correct that defendants are

01:47  25  going to be allowed to do discovery that I think is

01:47  1  appropriate, and I will tell you that it sounded to me like

01:47  2  there was some of the discovery that they're seeking -- the

01:47  3  defendants are seeking that might not require a witness.  I

01:47  4  mean, there might be more efficient ways of doing it, but, you

01:47  5  know, I don't know that we have any way of knowing that.  I can

01:47  6  tell you on the record that I have personally on this side of

01:47  7  the bench encountered issues specifically as -- I think it was

01:47  8  Mr. Rosenthal said specifically with -- dealing with witnesses

01:47  9  from Canada.  That really is a problem.  It's a problem for

01:47  10  Americans to be allowed to go there.  It's a problem for them

01:48  11  to be allowed to come here.  So let me turn this over to -- let

01:48  12  me -- I do -- it did sound to me like there was a lot of

01:48  13  discovery there that might be done more efficiently but that we

01:48  14  don't know at this time whether that will be possible or not.

01:48  15  So let me hear from the plaintiff with respect to -- I will

01:48  16  give you some of the reigns at this time about how you want me

01:48  17  to restrict what the defendants are allowed to do with the

01:48  18  understanding that if -- if we -- if I don't allow them to do

01:48  19  it now and they need to do the discovery later and it will take

01:48  20  them longer to do it than what we'd originally envisioned under

01:48  21  the discovery order, then that's when we might take care of it.

01:48  22  So what are your thoughts on that?

01:48  23      MR. ETHERIDGE:  Well, a couple of things there, and you're

01:48  24  right.  We do not want to delay the trial.  But a couple of

01:48  25  thoughts there, and I had brought it up before.  For example,

01:49  1    if they send a -- let's think about the mechanics there.  If

01:49  2    they send us to Fina to a firm who says, fine.  We'll comply.

01:49  3    We're going to send you all our files.  What's the mechanics

01:49  4    that we have at that point?  Do we -- how do we object?  Do we

01:49  5    file motions to -- I mean, do we file motions to quash and --

01:49  6    and if we even know about the correspondence, right?  I had

01:49  7    brought that up last week.  Our experience in the past is it's

01:49  8    very important -- this is about obtaining discovery that's

01:49  9    going to be in the case and both sides should do that.  We

01:49  10   should not be forced to run this -- to issue the same subpoenas

01:49  11   ourselves, and -- and I -- so that we know what it is that's

01:49  12   going to be produced and when.  I guess part of that could be

01:49  13   that maybe we -- it's teed up and it's ready to go, but we know

01:49  14   what those things are and then we be given, say, a two- or

01:49  15   three-week period after Markman to file our objections, our

01:49  16   motions to quash.  Something like that would put it on --

01:49  17   square on the footing of the other -- that would put it square

01:50  18   on the footing of the other domestic discovery if you want to

01:50  19   call it that.  Otherwise, I'm just concerned that some of

01:50  20   these -- some of this information might get turned over and we

01:50  21   have to deal with it.  I mean, my understanding of no discovery

01:50  22   had to do with not entangling the parties in unnecessary costs

01:50  23   and delay prior to the Markman.  And it seems like we've just

01:50  24   kind of stepped right back in it here.  And I'm just looking

01:50  25   for what the mechanics are and not wanting to take up the

01:50   1   Court's time over discovery disputes before they need to be.  I

01:50   2   guess if you say that you're giving us the reigns, maybe what

01:50   3   the answer there is that it's made clear in these subpoenas

01:50   4   that discovery -- that the production is not to happen until

01:50   5   two to three weeks after Markman, and that gives us an

01:50   6   opportunity to object and that also we're just copied on the

01:50   7   correspondence so we know what it is that's going to be

01:50   8   produced.  Or else we would have to file motions to quash on

01:51   9   many, many subpoenas just being overbroad, but if we knew what

01:51  10   it was that was going to be produced, we can meet and confer

01:51  11   and narrow it and get an understanding of what that is.  That's

01:51  12   some of the ideas.  I'm trying to work through the mechanics.

01:51  13        THE COURT:  Is it something that you think -- and I'll ask

01:51  14   both sides this.  It sounds to me like that's something maybe

01:51  15   you could sit down and come to an agreement with defense

01:51  16   counsel as to how they will react in those situations, and it

01:51  17   seems to me that if, for example, the -- well, let me hear from

01:51  18   Mr. Rosenthal.  My sense of what you're sending out is a

01:51  19   subpoena now, but I guess the plaintiff is correct that if you

01:51  20   send out -- I'm making up a number, a hundred subpoenas that

01:51  21   unless he cross-subpoenas immediately or unless he objects

01:51  22   immediately, then he might have waived his right to do so, and

01:52  23   I -- and I will tell you that that is one of the things that I

01:52  24   do try to avoid in discovery taking place before the Markman.

01:52  25   I'm very sympathetic to the defendants' concern about getting

01:52  1    the discovery it needs from foreign folks, but I don't want

01:52  2    that kind of preliminary getting ready to go to eat up the rule

01:52  3    and to require the plaintiff to spend as much time on this

01:52  4    discovery now as they would if it happened later.  Mr.

01:52  5    Rosenthal, do you have a resolution for that?

01:52  6        MR. ROSENTHAL:  Yes, Your Honor.  I think that -- first of

01:52  7    all, I think that the parties can work this out.  I mean, we

01:52  8    have a very simple goal, but it's not at all intentioned with

01:52  9    the goals of the rule or the goals that Mr. Etheridge talked

01:52  10   about.  Our goal is that we don't get stuck trying to take what

01:52  11   we think is relevant, important discovery from foreign sources

01:53  12   with not enough time to do it.  And our goal is advanced by

01:53  13   allowing us to proceed now with the preliminary steps that need

01:53  14   to be taken in order for that discovery to have a chance of

01:53  15   coming in during the discovery window.  We are absolutely fine

01:53  16   setting a date for production of any information, witnesses,

01:53  17   documents for sometime after the hearing, and if it helps to

01:53  18   have a buffer --

01:53  19       (Clarification by the reporter.)

01:53  20       MR. ROSENTHAL:  We are very happy and only anticipated

01:53  21   setting a date for production of any information, whether it's

01:53  22   documents or witnesses, for after the Markman hearing, and

01:53  23   we're happy to build in a buffer of a week or two or whatever

01:53  24   it is that we agree with plaintiffs is appropriate so that they

01:54  25   have an opportunity, and we also agree that their failure to

16

01:54  1  raise any motion practice or objections prior to the Markman

01:54  2  hearing will not constitute a waiver for those objections as

01:54  3  long as they're made promptly thereafter and we can set some

01:54  4  kind of a time line so that there's no surprises.

01:54  5      So I actually think that that's a fine solution.  It gives

01:54  6  us what we need, which is the runway that is necessary, as

01:54  7  everyone knows, to get discovery from foreign sources.  And it

01:54  8  serves the goal of not burdening the Court and the parties with

01:54  9  discovery disputes before the Markman hearing.  We never

01:54  10 anticipated that we would be doing that.  Our goal is simply to

01:54  11 get the process started as it would be with assignees and

01:54  12 inventors with respect to these other areas.

01:54  13     THE COURT:  Let me hear from plaintiff's counsel.  What --

01:54  14 assuming we build a buffer in here that would allow you to both

01:55  15 cross-subpoena, if you decided to wait until after the Markman

01:55  16 and to file your objections, does that satisfy you?

01:55  17     MR. ETHERIDGE:  Yeah.  It does.  And there's actually more

01:55  18 than just the parties, right, involved here.  There's these

01:55  19 third parties.  For example, if a law firm or a lawyer, because

01:55  20 they're actually talking about subpoenaing individuals, is

01:55  21 subpoenaed and he believes his information's attorney/client

01:55  22 privilege, you know, what's the mechanism for him to object or

01:55  23 file his motion to quash?  And I think what we'd have to do is

01:55  24 in all the notices to these people to tell them that they have

01:55  25 until whatever the date of the Markman is but some time period

01:55   1   after that to file their motions and that we anticipate

01:55   2   production being made, you know, whatever it is, 21 days after

01:55   3   that.  I think that that would probably work, and then we --

01:55   4   we'd just need to make sure that we're copied on the

01:55   5   communications so that we know who -- and I don't just mean the

01:56   6   subpoena because often what we've seen before is there's a

01:56   7   whole litany of communications back and forth narrowing the

01:56   8   scope, saying, produce this, don't produce that, and then when

01:56   9   we get the production, we have no idea.  Is this totally

01:56  10   responsive to the subpoena, or is this something that was

01:56  11   negotiated?  And historically we've had to move to compel those

01:56  12   communications and they have been compelled.  Often they

01:56  13   come -- to your point, they come late in the game and they can

01:56  14   cause delay because things are missing, but I do think we can

01:56  15   work with them on these dates.  It sounds like they're willing

01:56  16   to do that and happy to give that a shot together.

01:56  17        THE COURT:  Well, I feel a little bit like Dr. Phil.

01:56  18   We've gotten together and we talked this through and we all

01:56  19   feel warm towards each other and we'll be able to make this

01:56  20   work.  So I'll tell you what.  Why don't we break now?  You

01:57  21   all -- while we're in a happy mood -- and see if you all can

01:57  22   come up with sort of a structure for all that to take place.

01:57  23   Again, if you can't, if you come across something that you both

01:57  24   think it's willing to, you know, go up the hill and die for

01:57  25   because it's to support your client, then I am sympathetic to

18

01:57   1   that.  I had clients for a lot of years and I'll be happy to

01:57   2   reset the hearing on very short notice because it won't last

01:57   3   very long.  But you all get together.  I think my general

01:57   4   thoughts are I definitely want to give the defendant every

01:57   5   opportunity now to contact the folks that they need to contact

01:57   6   and essentially allow those people to know that discovery is

01:57   7   going to be initiated.  That being said, I don't want -- I

01:58   8   don't want either party to be over burdened by actually

01:58   9   conducting discovery during the phase that I think should be

01:58   10  dedicated to handling the Markman issues.  But I'm always

01:58   11  going -- to be clear, I think I've got lawyers on both sides of

01:58   12  this case who know me intimately.  I am always available to try

01:58   13  and resolve any differences that you all might have and, you

01:58   14  know, to make this work out, but that's for both sides.  I

01:58   15  think it certainly works well to let -- I'll make up a name.

01:58   16  You know, it could be -- I'll just make up a name -- Microsoft

01:58   17  Japan.  If -- you know, let them know now what's coming.  That

01:58   18  will give them an opportunity to get any concern they might

01:58   19  have about any attorney/client issues squared away.  I'll allow

01:59   20  the plaintiff to decide after the Markman which folks he wants

01:59   21  to cross-subpoena, but I can't imagine there would be so much

01:59   22  stuff the plaintiff would want that it would overly burden any

01:59   23  third party.  My guess would be it might just be filling in a

01:59   24  couple things and at least be -- in fact, let me add one thing

01:59   25  I think the defendants ought to put in whatever they send,

01:59  1  which is that after May or whatever the date is you all decide

01:59  2  the exact date, you might let them know that they might be

01:59  3  getting a cross-subpoena that will ask them for some additional

01:59  4  documents, not many, that will probably be relevant to issues

01:59  5  that are involved in this litigation.  That way --

01:59  6      MR. ROSENTHAL:  Makes sense to us, Your Honor.

02:00  7      THE COURT:  And so does that work at least for the moment

02:00  8  for everyone and with the understanding that if after you talk

02:00  9  you're absolutely welcome to let me know that there are some

02:00  10 issues you need to work out and we'll -- I'll keep massaging

02:00  11 this until we get it done?

02:00  12     MR. ETHERIDGE:  That works for plaintiff, Your Honor.

02:00  13     MR. ROSENTHAL:  And for defendants.  Thank you, Your

02:00  14 Honor.

02:00  15     THE COURT:  There you go.  Another successful therapy

02:00  16 session in a half hour.  So if only I could charge what Dr.

02:00  17 Phil charges.

02:00  18     So I hope you all have a wonderful day.  Be safe out

02:00  19 there.

02:00  20     MR. SIEGMUND:  Judge Albright.

02:00  21     THE COURT:  Yes, sir.

02:00  22     MR. SIEGMUND:  This is Mark Siegmund.  Not to break up the

02:00  23 happy Dr. Phil session, but I think we might have had one more

02:00  24 I think a relatively smaller issue to bring up with you if

02:00  25 that's okay.

                                                                    20

02:00   1        THE COURT:  That will break up the Dr. Phil session, but I

02:00   2    guess we've got to go ahead and take it anyway.

02:00   3        MR. SIEGMUND:  Yes, sir, Your Honor.  So I believe Mr.

02:01   4    Shelton brought this up in an e-mail to Hannah I think he sent

02:01   5    yesterday about whether there are deficient amended -- we filed

02:01   6    an amended complaint, and there are currently a -- there was a

02:01   7    pending motion to dismiss in each of the filed cases.  We filed

02:01   8    an amended complaint I believe this past Monday.  So we believe

02:01   9    that the amended complaints are moot, and I cited the Court

02:01   10   some case law in the e-mail I sent earlier, and if you want, I

02:01   11   can share that with you, but I think Your Honor's aware of

02:01   12   that.  And so we think that this issue really is not even ripe

02:01   13   to bring up to your attention.  We haven't met and conferred on

02:01   14   Dell's allegations of our deficient amended complaints.  We

02:01   15   haven't really met and conferred with them at all about that

02:01   16   particular issue.  So we don't really think it's ripe for the

02:01   17   Court's review right now, but I wanted to bring that to your

02:01   18   attention in case you wanted to take that up right now.

02:02   19       THE COURT:  Mr. Shelton, have you filed a motion to

02:02   20   dismiss with respect to the amended complaints?

02:02   21       MR. SHELTON:  Your Honor, this is Barry Shelton.  Not yet.

02:02   22   We will be amending the motions that had been filed before and

02:02   23   refiling.  And the issue that we wanted to bring to the Court's

02:02   24   attention or make a request is that the Court set an expedited

02:02   25   motion hearing on these motions to dismiss.  I think the Court

02:02  1  probably remembers vividly the -- I believe it was the first

02:02  2  time that you set I think eight cases or so, eight different

02:02  3  cases that had pending motions to dismiss on January 31st.

02:02  4  Let's just call that the De La Vega hearing.  And that will go

02:02  5  down in infamy in the Western District.  And the reason why we

02:02  6  wanted to bring this up is that the motions to dismiss, all 12

02:02  7  of them that were filed in these cases, really are of the same

02:03  8  merit in strength as the motion that was filed in the De La

02:03  9  Vega case by Microsoft.  And I think it was quite beneficial

02:03  10  that Your Honor held, you know, a fairly early hearing on not

02:03  11  just that -- that motion but the other I think it was seven

02:03  12  cases back in January and we wanted to make that same request

02:03  13  here.  I know from my other cases that the Court has a growing

02:03  14  stock of pending motions to dismiss, and we think that these

02:03  15  cases would benefit greatly from the Court's expediting a

02:03  16  motion hearing, and then that's all that we wanted to bring up.

02:03  17      THE COURT:  When you bring up the De La Vega case, is the

02:03  18  concern writ large of your motions to dismiss that the

02:03  19  plaintiff has not adequately tracked the claim elements as they

02:04  20  did -- they failed to in that case in their pleading -- in

02:04  21  their complaint and it's something you can specifically

02:04  22  identify what's missing?  Is it that type of motion?

02:04  23      MR. ROSENTHAL:  Your Honor, it's Brian Rosenthal.  Perhaps

02:04  24  I can speak to that.  The answer is yes.  It's more than a

02:04  25  technical failing, and I don't want to argue the motion, but

| | | |
|---|---|---|
| 02:04 | 1 | the basic premise of the motion, there's -- the motions deal |
| 02:04 | 2 | with both direct infringement allegations and indirect.  The |
| 02:04 | 3 | indirect allegations, they're just missing, you know, presuit |
| 02:04 | 4 | knowledge.  But with respect to the direct allegations, it is |
| 02:04 | 5 | exactly that.  The complaints, not all of them, but the ones |
| 02:04 | 6 | that we moved on that issue, the complaints are just missing |
| 02:04 | 7 | any allegation that in any way matches up with some of the key |
| 02:05 | 8 | limitations.  And we pointed this out to the plaintiff in a |
| 02:05 | 9 | letter and we pointed it out in our original motion to dismiss |
| 02:05 | 10 | on these patents, and then the amended complaints just changed |
| 02:05 | 11 | a couple of words here or there or added a -- you know, a |
| 02:05 | 12 | website printout but by and large didn't address that issue at |
| 02:05 | 13 | all.  And so these are motions in which there are elements that |
| 02:05 | 14 | are simply totally missing from any evidence and in many cases |
| 02:05 | 15 | the evidence that they do cite that they do rely on states even |
| 02:05 | 16 | sometimes in the quotation that it doesn't do it in the manner |
| 02:05 | 17 | claimed.  So it's those sorts of arguments that are raised by |
| 02:05 | 18 | these motions. |
| 02:05 | 19 | THE COURT:  And when do you -- Mr. Shelton or Mr. |
| 02:05 | 20 | Rosenthal, when do you intend -- when do you anticipate filing |
| 02:05 | 21 | the motion to dismiss by? |
| 02:06 | 22 | MR. ROSENTHAL:  So this is Brian Rosenthal again.  I |
| 02:06 | 23 | expect the amended complaints were filed on Monday.  I think we |
| 02:06 | 24 | technically have two weeks, but I expect we'll be filing them |
| 02:06 | 25 | next week.  They're going to be very similar to the original |

02:06  1   motions.  Obviously we have to take into account the couple of

02:06  2   small changes that were made.

02:06  3        THE COURT:  So -- oh, if someone's going to speak, please

02:06  4   go ahead.

02:06  5        MR. SIEGMUND:  Your Honor, I was just going to say I think

02:06  6   they pretty much came out and said that their original motions

02:06  7   are moot, and we are happy to respond and have a hearing on

02:06  8   this issue.  We just haven't had a chance to digest the letters

02:06  9   that they sent to us.  Like I said, they did file -- they did

02:06  10  send us original letter on September 30th which led us to

02:06  11  actually file our amended complaint.  We disagree obviously

02:06  12  that there were any issues, but we went ahead and took the

02:06  13  conservative approach, amended our complaint.  They sent us two

02:06  14  new letters last night after working hours and this morning.

02:07  15  So we really haven't had any time to digest those particular

02:07  16  letters or any of those issues.  So we think that their current

02:07  17  motions are moot, and like -- it sounds like they are going to

02:07  18  refile a motion to dismiss, and that's fine, and we'll respond

02:07  19  in time, and then if the Court deems that a hearing's

02:07  20  necessary, we obviously are more than happy to take that up,

02:07  21  but I don't -- I don't think that this is a De La Vega issue

02:07  22  because I was also a little bit involved in that as well, and I

02:07  23  don't think these complaints are anywhere near the disaster

02:07  24  that I think we can all agree that the De La Vega issue brought

02:07  25  up.

24

| | | |
|---|---|---|
| 02:07 | 1 | THE COURT:  Well, it wasn't a disaster for the defendants |
| 02:07 | 2 | in that case. |
| 02:07 | 3 | (Laughter.) |
| 02:07 | 4 | MR. SHELTON:  It was not, Your Honor. |
| 02:07 | 5 | MR. SIEGMUND:  It was not.  That is true, Your Honor. |
| 02:07 | 6 | THE COURT:  Well, here's where I'm at.  I think y'all are |
| 02:07 | 7 | missing each other a little bit in that if the question is do I |
| 02:07 | 8 | find that the motions to dismiss -- current motions to dismiss |
| 02:07 | 9 | are moot, the answer is -- if the plaintiff has filed amended |
| 02:08 | 10 | complaints, then yes.  I'm not going to take the time -- I will |
| 02:08 | 11 | tell you now they're all denied.  I'm not going to take up |
| 02:08 | 12 | motions on -- in a complaint that is no longer the live |
| 02:08 | 13 | complaint.  However, I appreciate being alerted to the fact |
| 02:08 | 14 | that there may be a motion to dismiss that is a gating motion. |
| 02:08 | 15 | So I will put the burden on Mr. Shelton, and when the case is |
| 02:08 | 16 | ripe, meaning all the back and forth between the parties has |
| 02:08 | 17 | taken place, if you'll just let whoever it is that's handling |
| 02:08 | 18 | this case, you know, know, we'll set it for a hearing |
| 02:08 | 19 | relatively quickly, and by relatively quickly I mean within a |
| 02:08 | 20 | couple of weeks, and I'll take it up and I will resolve it.  So |
| 02:08 | 21 | good heads up.  I'm going to find that -- I'm going to find the |
| 02:09 | 22 | current motions to dismiss are moot, but I'm also denying them |
| 02:09 | 23 | without prejudice to the refiling of new motions to dismiss. |
| 02:09 | 24 | Is there anything else we need to take up? |
| 02:09 | 25 | MR. ROSENTHAL:  Your Honor, I'm sorry.  Your Honor, it's |

25

02:09  1   Brian Rosenthal.  That makes sense.  I only have just a

02:09  2   housekeeping issue to raise which is more by way of question

02:09  3   and a little bit informative.  I think the parties are zeroing

02:09  4   in on a way to handle these 12 cases by grouping them into

02:09  5   buckets which I understand is similar to how it's been done in

02:09  6   some of the other cases by plaintiff.  So I'm fully optimistic

02:09  7   that we're going to get agreement on what those buckets will

02:09  8   look like and we'll have those for Your Honor in the scheduling

02:09  9   order that we propose.

02:09  10       The question that I have is on the scheduling order

02:09  11  itself, I assume that what you're interested in is a proposed

02:09  12  schedule that goes through Markman and that you'll deal with

02:10  13  scheduling the rest of the case at that time, but just wanted

02:10  14  to get clarity on that because I know that -- I certainly

02:10  15  understand from some past cases that that's what you're looking

02:10  16  for but just wanted to get some clarity.

02:10  17       THE COURT:  Well, my recollection, and, you know, maybe

02:10  18  Mark Siegmund can correct me as a former clerk or Barry Shelton

02:10  19  can because he has so many cases or maybe I'll go grab Josh,

02:10  20  but my recollection is that we -- for Markman purposes we tend

02:10  21  to do all the patents at once.  Did I say something different

02:10  22  in this case that we were going to split them up?  I may have.

02:10  23  I just don't remember.

02:10  24       MR. SIEGMUND:  Your Honor, in this case because there are

02:10  25  so many, we actually have two days for Markman and hence why

02:10  1    we're breaking them into buckets.  So, for example, if we're

02:10  2    going to take Bucket 1 on Day Morning 1, we can do that.  That

02:10  3    was our plan for you.

02:10  4        THE COURT:  But I was assuming the two days would be -- I

02:10  5    mean, I knew that we had set aside two days.  Did we decide

02:11  6    that it was best to have a Friday for Bucket 1 or six and then

02:11  7    wait and give more time for the second ones, or were we

02:11  8    planning to do them -- all of them but it was to be over two

02:11  9    days?  I can't remember.

02:11  10        MR. SIEGMUND:  Your Honor -- I'm sorry if I'm interrupting

02:11  11    somebody.

02:11  12        (Simultaneous conversation.)

02:11  13        MR. ETHERIDGE:  I just checked.  Those dates are

02:11  14    April 29th and April 30th.  So they're on a Thursday, Friday.

02:11  15    And what remains is the Court has reserved those dates for us,

02:11  16    and what remains is for the parties to decide the best way to

02:11  17    present the issues to the Court and you can either call them

02:11  18    buckets.  I prefer -- I always think of bad things in buckets

02:11  19    so I just prefer groupings.  But that is the plan that we're

02:11  20    working on.

02:11  21        I guess I don't see there's any reason to stop at the

02:11  22    Markman.  I think the Court will issue a trial date.  I think

02:11  23    we should do the rest of the schedule.  If something comes up

02:12  24    that requires that to be modified, the parties are free to ask

02:12  25    the Court to modify them.

02:12  1         THE COURT:  Well, let me make clear.  It is very

02:12  2    unlikely -- this is the reason I asked the last question.  It

02:12  3    is very unlikely we would go to trial on 12 patents.  I -- you

02:12  4    know, for example, I've got VLSI versus Intel which had a bunch

02:12  5    of patents and we've broken that up at the insistence of the

02:12  6    plaintiff into three, even though I would have probably been

02:12  7    happy with just two trials, but unlikely we'll do 12 patents in

02:12  8    one trial.  That will probably be at least two trials.  And

02:12  9    that's probably another reason for breaking them up into

02:12  10   buckets or groups.  Just -- I could see having two groups of

02:12  11   patents, say, all together, say six patents and doing it at

02:12  12   once, and that would help me figure out how to do the trials.

02:13  13        MR. ETHERIDGE:  Well, right, Your Honor.  And we discussed

02:13  14   this in the Microsoft case.  And we agreed that the buckets or

02:13  15   the groupings, if you will, are for Markman purposes only.

02:13  16   There's not going to be 12 trials on one patent or one trial on

02:13  17   12 patents.  That's for sure.  The problem is is until we get

02:13  18   to Markman and even afterwards there may be patents that fall

02:13  19   out because of 101 issues.  There may patents that fall out on

02:13  20   IPR issues, and we just had this similar situation up with

02:13  21   Judge Payne, and, you know, maybe three or four months out the

02:13  22   cases in effect were consolidated for purposes of discovery and

02:13  23   things like that, but three or four months out he asked the

02:13  24   parties, hey.  Tell me how we're going to try these.  At that

02:13  25   time we had -- and, you know, we came up with -- I think it

| | | |
|---|---|---|
| 02:13 | 1 | ended up being six or seven patents across three trials, but I |
| 02:13 | 2 | don't think we have that visibility until -- you know, it's an |
| 02:13 | 3 | ongoing process.  And so I encourage the Court, let's get our |
| 02:14 | 4 | schedule.  Let's work toward it and let's see what happens in |
| 02:14 | 5 | the Markman.  Some things may fall out.  There may be some 101 |
| 02:14 | 6 | motions that take things out.  I'm pretty sure there are going |
| 02:14 | 7 | to be IPRs filed, and as the case moves forward, we can see |
| 02:14 | 8 | what that trial's going to look like. |
| 02:14 | 9 | THE COURT:  Okay. |
| 02:14 | 10 | MR. ROSENTHAL:  Your Honor, this is Brian Rosenthal.  I |
| 02:14 | 11 | couldn't agree more that the -- it's very likely that we're |
| 02:14 | 12 | going to have patents dropping out.  I expect that some of them |
| 02:14 | 13 | will drop out before Markman.  But I totally agree with the |
| 02:14 | 14 | spirit of what Jim is saying which is that the case is going to |
| 02:14 | 15 | change the nature, you know, of the -- and the scope of the |
| 02:14 | 16 | case won't really be clear until at least the Markman or |
| 02:14 | 17 | sometime thereafter, and so our thinking was only that let's |
| 02:14 | 18 | make sure that we have all of the dates leading up to Markman |
| 02:14 | 19 | in stone.  Let's, you know, work as much as we can to get |
| 02:14 | 20 | everything ready so that we can hit the ground running with |
| 02:15 | 21 | respect to discovery, but then the setting of the remainder of |
| 02:15 | 22 | the schedule seems to make most sense once we come to that |
| 02:15 | 23 | point when we have a better sense of what the scope of the case |
| 02:15 | 24 | is.  That was our only suggestion. |
| 02:15 | 25 | THE COURT:  Okay.  I think we're back to our Dr. Phil |

02:15  1    moment where everyone's happy.  And I think we probably ought

02:15  2    to adjourn at this time while we're all feeling good about

02:15  3    ourselves and how we've done in the case.

02:15  4         So putting that at risk, is there anything else from the

02:15  5    plaintiff?

02:15  6         MR. ROSENTHAL:  Not from defendant.

02:15  7         MR. SIEGMUND:  Not from the plaintiff, Your Honor.

02:15  8         THE COURT:  Okay.  Thank you very much.  Have a safe day,

02:15  9    and I look forward to seeing at least some of you hopefully in

02:15  10   the near future.  Take care.  Bye.

02:40  11        (Hearing adjourned at 2:40 p.m.)

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

1   UNITED STATES DISTRICT COURT )

2   WESTERN DISTRICT OF TEXAS    )

3

4        I, Kristie M. Davis, Official Court Reporter for the

5   United States District Court, Western District of Texas, do

6   certify that the foregoing is a correct transcript from the

7   record of proceedings in the above-entitled matter.

8        I certify that the transcript fees and format comply with

9   those prescribed by the Court and Judicial Conference of the

10  United States.

11       Certified to by me this 2nd day of October 2020.

12

13                              */s/ Kristie M. Davis*
                                KRISTIE M. DAVIS
                                Official Court Reporter
14                              800 Franklin Avenue
                                Waco, Texas 76701
15                              (254) 340-6114
                                kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25