**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| WSOU INVESTMENTS, LLC d/b/a BRAZOS LICENSING AND DEVELOPMENT,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>DELL TECHNOLOGIES INC., DELL INC., AND EMC CORPORATION,<br><br>　　　　Defendants. | Case No. 6:20-cv-00473-ADA<br>Case No. 6:20-cv-00478-ADA<br><br><br><br>**JURY TRIAL DEMANDED** |

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF REGARDING
PATENT NOS. 9,137,144 & 7,126,921**

## TABLE OF CONTENTS

Page

I.  DISPUTED TERMS FROM THE '144 PATENT ............................................................. 1

    A.  "group of communication traffic" (claims 1, 4, 11, 12, 14) ....................................2

    B.  "V is a group identifier corresponding to the group of communication traffic" (claims 1, 11, 14) ...............................................................................4

II. DISPUTED TERMS FROM THE '921 PATENT ............................................................. 7

    A.  "fast propagation" (Claims 1, 9, & 17) ...................................................................8

        1.  The term "fast propagation" is indefinite ......................................................... 8

        2.  In the alternative, "fast propagation" at least requires propagation that is faster than OSPF .............................................................................................. 9

    B.  "data plane means for forwarding packets between the nodes" (Claim 1) / "data plane means for forwarding packets to other nodes in the network" (Claims 9 & 17) ......................................................................................11

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*3M Innovative Properties Co. v. Avery Dennison Corp.*,
    350 F.3d 1365 (Fed. Cir. 2003) ................................................................................................5, 6

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
    616 F.3d 1249 (Fed. Cir. 2010) ....................................................................................................12

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
    783 F.3d 1374 (Fed. Cir. 2015) ......................................................................................................8

*Digital Retail Apps, Inc. v. H-E-B, LP*,
    No. 6-19-00167-ADA, 2020 WL 376664 (W.D. Tex. Jan. 23, 2020) ..........................................6

*Graphics Props. Holdings, Inc. v. ASUS Comp. Int'l, Inc.*,
    2014 WL 4929340 (D. Del. Sept. 29, 2014) .................................................................................8

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
    902 F.3d 1372 (Fed. Cir. 2018) ......................................................................................................8

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014) ......................................................................................................8

*Neodron, Ltd. v. Dell Techs., Inc.*,
    No. 1-19-00819-ADA, 2019 WL 9633629 (W.D. Tex. Dec. 16, 2019) ......................................6

*Nexus Display Techs. LLC v. Dell Inc.*,
    No. 2:14-CV-762, 2015 WL 5578735 (E.D. Tex. Sept. 22, 2015) ...............................................8

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................................................................................3, 5

*Poly-Am. L.P. v. API Indus., Inc.*,
    839 F.3d 1131 (Fed. Cir. 2016) ......................................................................................................5

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
    442 F.3d 1322 (Fed. Cir. 2006) ................................................................................................4, 11

ii

## TABLE OF EXHIBITS

| Exhibit | Description |
|---|---|
| 1 | Excerpts from the file history of U.S. Patent No. 9,137,144 ("11/8/14 App. Arg.") |
| 2 | Plaintiff's Infringement Contentions for U.S. Patent No. 9,137,144 (dated October 14, 2020) ("'144 Infringement Contentions) |
| 3 | Agreed constructions for U.S. Patent No. 7,126,921 ("Agreed Constructions") |
| 4 | Plaintiff's Infringement Contentions for U.S. Patent No. 7,126,921 (dated October 14, 2020) (annotated) ("'921 Infringement Contentions") |

**TABLE OF ABBREVIATIONS**

| Abbreviation | Term/Document(s) |
|---|---|
| '144 patent | U.S. Patent No. 9,137,144 |
| '921 patent | U.S. Patent No. 7,126,921 |
| Br. | Opening Claim Construction Brief (Case No. 6:20-cv-00473-ADA, Dkt. 74; Case No. 6:20-cv-00478-ADA, Dkt. 85) |
| POSA | Person of skill in the art |
| VLAN | Virtual Local Area Network |
| WSOU | WSOU Investments, LLC D/B/A Brazos Licensing and Development |

*Emphasis added unless indicated otherwise.*

There are only four disputed terms from the '144 and '921 patents. For the '144 patent, Defendants propose constructions mandated by the plain language of the claim and based on explicit disclaimers in the prosecution history. WSOU seeks to avoid construction of either term so that it can argue to the jury that the claims mean the opposite of what the applicant told the patent office to obtain the patent in the first place and what the claims plainly require.

The claims of the '921 patent are indefinite because they require "fast propagation" but provide no basis to determine what "fast" means. WSOU's plain meaning proposal would effectively eviscerate the term altogether. The parties also dispute the corresponding structure for "data plane means," from which WSOU incredibly attempts to exclude the "data plane" altogether, which—unsurprisingly—contradicts the entirety of the specification.

## I.   DISPUTED TERMS FROM THE '144 PATENT

The '144 patent relates to assigning traffic in VLANs to network paths. According to the patent, the prior art methods of assignment, "in some situations, fail to fully utilize all available paths when" assigning VLANs to paths. '144 patent, 2:8–10. The patent proposes to solve this alleged deficiency by using a specific formula—V mod N—to assign a VLAN to a path.[1] *See id.*, 6:20–23. As shown in Table 3, V is an ID number assigned to each VLAN—*e.g.,* 99, 100, etc.:

| TABLE 3 | | TABLE 3-continued | |
|---|---|---|---|
| VLAN TABLE | | VLAN TABLE | |
| VLAN | V | VLAN | V |
| VLAN1 | 099 | VLAN8 | 106 |
| VLAN2 | 100 | VLAN9 | 107 |
| VLAN3 | 101 | VLAN10 | 108 |
| VLAN4 | 102 | VLAN11 | 109 |
| VLAN5 | 103 | VLAN12 | 110 |
| VLAN6 | 104 | | |
| VLAN7 | 105 | | |

*Id.*, 5:55–6:10. N is the number of possible paths through the network. An exemplary network is

---

[1] "Modulus" or "mod" is a well-known calculation that yields the remainder after division. For example, the result of "12 mod 5" is 2, because the remainder, when dividing 12 by 5, is 2.

shown in Figure 2:



FIG. 2

As shown in the Figure 2 example above, there are nine possible shortest-distance (three hops) network paths from C to D (*i.e.,* N=9). Table 4 shows how each VLAN is assigned to these nine possible paths using the V mod N formula:

TABLE 4

PATH SELECTION TABLE

| Index | Path | VLAN | VLAN |
|---|---|---|---|
| 0 | 20:23 | VLAN1 | VLAN10 |
| 1 | 20:24 | VLAN2 | VLAN11 |
| 2 | 20:25 | VLAN3 | VLAN12 |
| 3 | 21:23 | VLAN4 | |
| 4 | 21:24 | VLAN5 | |
| 5 | 21:25 | VLAN6 | |
| 6 | 22:23 | VLAN7 | |
| 7 | 22:24 | VLAN8 | |
| 8 | 22:25 | VLAN9 | |

For example, VLAN1 has a V of 99 (*see* Table 3 above), and hence is assigned path 0 (*i.e.,* 99 mod 9 is 0). VLAN has a V of 100 (*see* Table 3 above), and hence is assigned path 1 (*i.e.,* 100 mod 9 is 1). And so on for all VLANs. *Id.*, 6:26–39. The result is an even "round robin" distribution of VLANs across paths, while keeping all traffic within a VLAN (or other communication group) on the same path. *Id.*, 6:20–24.

A. "group of communication traffic" (claims 1, 4, 11, 12, 14)

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| "traffic in a VLAN or other identifiable communications group" | Plain and ordinary meaning |

Defendants' construction is mandated by the claims. Each asserted claim requires "V is a

2

group identifier corresponding to the group of communication traffic." *Id.*, 9:19–21, 10:17–18; 10:35–37.  Since the claims require a "group identifier" that corresponds to the "group of communication traffic," it is axiomatic that the group must be "identifiable."  Defendants' construction is necessary to prevent an argument that packets that have ***nothing to do with each other*** are somehow argued to be a "group" because they happen to be sent from, or to, the same place.  To the contrary, the claims require using an identifier that corresponds to an identifiable group, such as a VLAN.

The specification strongly supports Defendants' construction, which is drawn verbatim from the patent.  According to the patent, "each ***VLAN (or other identifiable communications group)***" is assigned a path.  *Id.*, 7:25–26.  The specification explains that, instead of sending all traffic over a single path, "[i]n most implementations, ***respective groups of communication traffic*** will be assigned to different paths to spread traffic load and use the network resources more efficiently." *Id.*, 7:17–20.  It continues that "VLANs are one way of grouping traffic," and as set forth in the quote above, the identifier could also correspond to "other identifiable communication group(s)."  *Id.*, 7:20–26.[2]  This makes perfect sense as the alleged shortcoming the patent attempts to address is "associated with selecting network communication paths ***for VLANs and other groups of data traffic***."  *Id.*, 2:21–22.

Contrary to WSOU's allegations, Defendants are not trying to inject limitations into the claim. Br. 5–6.  Defendants' construction is precisely how the term would have been understood by a POSA reading the claim language in view of the specification.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (claim term is given "the meaning that the term would have to a

---

[2] Unasserted dependent claim 2 is more narrow, and requires the group of communication traffic to be a VLAN. *Id.*, 9:22-23.

3

person of ordinary skill in the art in question at the time of the invention"). By arguing that groups need not be "identifiable," WSOU takes a position directly contrary to the language in the claims, because V cannot be used to determine the path unless there is an identifiable group. WSOU should not be able to argue—contrary to the claims and the specification—that all traffic that happens to be routed over the same path constitutes a group. Indeed, if WSOU were to successfully argue that a "group" is defined simply by packets that happen to follow the same path, the entire purpose of the patent—which is to keep together traffic that is intended to be kept together, such as traffic for a particular VLAN—would be subverted. The Court should give this term the meaning that is mandated by the claim language and specification.

### B. "V is a group identifier corresponding to the group of communication traffic" (claims 1, 11, 14)

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| Plain and ordinary meaning; but the group identifier cannot be a hash value based on packet fields such as source address and destination address | Plain and ordinary meaning |

Defendants' construction is based directly on the prosecution history, during which applicant unambiguously disavowed any scope that would allow the group identifier (V) to cover a hash value based on packet fields such as source address and destination address. Specifically, to overcome a rejection over the Matthews reference on the claims at issue here, applicant stated that "Matthews does not teach or suggest . . . 'V is a group identifier corresponding to a group of communication traffic.'" Ex. 1, (11/8/14 App. Arg.) at 6 (emphasis in original). Applicant then explained that, although Matthews performs a mod operation, it is on a hash value, and "the hash value in Matthews does not 'correspond to a group of communication traffic.'" *Id*. Instead, according to applicant, Matthews disclosed "performing a hashing function on fields in the packet [], such as the source address field [] and the destination address field." *Id*.

Thus, applicant expressly disavowed any construction of the "V" term that would include

4

such a hashing function. Defendants' construction thus excludes exactly what applicant disclaimed during prosecution: a hash value based on packet fields including source address and destination address.[3] WSOU impermissibly ignores this critical prosecution history.

That V cannot be a hash value based on packet fields is consistent with the specification. The very purpose stated in the patent—*i.e.,* to fully utilize all available paths when making path assignments—would be undermined if V were a hash value based on packet fields. *Id.*, 2:7–11. To fully utilize available paths, the patent described assigning VLANs to paths in a round robin fashion, as illustrated in Figures 3 and 4 and described above. This creates an even distribution of traffic groups across the different paths. *Id.* Using a hash on packet fields for the group identifier, on the other hand, would not create the desired uniform distribution that is the purpose of the patent. Instead, any packets that happen to be sent between the same source and destination would be assigned the same path.

WSOU does not attempt to justify its lack of construction, but instead launches an attack focused entirely on asserting there was no disavowal. As an initial matter, finding disavowal is not necessary to construe a claim term consistent with how it is used in prosecution. *See Phillips*, 415 F.3d at 1317 ("[T]he prosecution history provides evidence of how the PTO and the inventor understood the patent."). Even if disavowal were required, applicant's unequivocal statements rise to that level because applicant explicitly stated that a hash value based on packet fields does ***not*** correspond to a group of communication traffic. *See Poly-Am. L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1137 (Fed. Cir. 2016) (finding clear and unmistakable disavowal in prosecution history

---

[3] WSOU relies upon exactly such a hash value to meet the V limitation in its infringement contentions. *See* Ex. 2 at 3; *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1327 (Fed. Cir. 2006) ("Although the construction of the claim is independent of the device charged with infringement, it is convenient for the court to concentrate on those aspects of the claim whose relation to the accused device is in dispute." (quotation omitted)).

notwithstanding claim language that implied a broader scope). It is difficult to imagine a clearer disavowal of claim scope than made here by applicant.

WSOU's reliance on *3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365 (Fed. Cir. 2003) is misplaced. *First*, WSOU sidesteps the pertinent disavowal language from applicant's damning November 18, 2014 remarks, quoted above—which clearly disavows the possibility of V being a hash based on packet fields—by focusing on a different portion of the prosecution history. Br. 7–8. *Second*, *3M* involved a patent where applicant expressly defined the term in the specification and then made a statement during prosecution history that was arguably ***contrary*** to that express definition. 350 F.3d at 1372–73. Here, on the other hand, the prosecution history that distinguished V as a group identifier from a hash value based on the packet fields is ***wholly consistent*** with the claims and specification as discussed above.

This Court has repeatedly construed terms based on their plain meaning, but with a restriction based on the intrinsic record. *See Digital Retail Apps, Inc. v. H-E-B, LP*, No. 6:19-cv-167, 2020 WL 376664, *19 (W.D. Tex. Jan. 23, 2020) ("wirelessly transmitting" "does not include photographing or scanning" because the specification makes clear they are distinct); *Neodron, Ltd. v. Dell Techs., Inc.*, No. 1:19-cv-819, 2019 WL 9633629 (W.D. Tex. July 28, 2020) (construing "a substrate having a surface with an arrangement of electrodes mounted thereon" as "plain and ordinary meaning, which is a substrate having a surface with an arrangement of electrodes mounted thereon, but wherein a surface of the substrate is a subset of the surface area of the surface area of the substrate and not the entire surface area or opposing surfaces on the substrate").

The same reasoning and result should apply here. Applicant clearly and unambiguously distinguished the claimed "V" term from a hash value based on packet fields. WSOU cannot ignore that distinction now to obtain broader scope to pursue an infringement theory against

precisely the same thing that was distinguished to obtain the claims.

## II.  DISPUTED TERMS FROM THE '921 PATENT[4]

The '921 patent describes network nodes that perform "fast distribution of node related information" using a data plane, instead of a control plane. *See* '921 patent, 5:1–12. The patent explains that, in both the prior art and the claimed invention, the data plane and control plane are distinct: "FIG. 2, showing a ***division*** of the network 1 ***into a control plane 100 and a data plane 102***. Each node and link of the network ***has a representation in the control plane as well as in the data plane***. . . . FIG. 4 illustrates the structure of a node 170 having ***Control plane 200*** and ***Data Plane***." *Id.*, 1:28–32, 5:58–59; *see id.*, 5:65–6:5, Fig. 2 (annotated below), Fig. 4 (*see* p. 13).



The patent also explains in the "Background" that it was known that link state information could be propagated using "a routing protocol such as OSPF (Open Shortest Path First)" which "runs in the distributed ***control plane 100*** of the network 1." *Id.*, 2:3–15. The patent notes, however, that sending link state information "via ***OSPF protocol [] is slow***." *Id.*, 2:22–24. Thus,

---

[4] Exhibit 3 lists the parties' agreed to constructions for the '921 patent.

the patent discloses networks and methods which "provide forwarding of the link state information *in the data plane much faster than*, e.g. *by using OSPF routing protocol*." *Id.*, 11:48–50.

### A.   "fast propagation" (Claims 1, 9, & 17)

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| Indefinite.  In the alternative this means "much faster than using the computing means, e.g., by using OSPF routing protocol" | Plain and ordinary meaning |

#### 1.   The term "fast propagation" is indefinite

Each claim requires "fast propagation" of node related information and link state information. The word "fast" is undisputedly a term of degree. As such, "the court must determine whether the patent provides 'some standard for measuring that degree.'" *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (citation omitted). That standard "must provide *objective boundaries* for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

The '921 patent fails to provide any objective criteria for what would constitute "fast propagation" of node related information or link state information. The claims say nothing about how fast "fast propagation" must be, nor do they provide any reference point for comparison. *See* '921 patent, Cls. 1, 9, 17. The specification also fails to provide sufficient guidance regarding how a POSA might objectively measure whether these limitations have been met. This is similar to *Graphics Props. Holdings, Inc. v. ASUS Comp. Int'l, Inc.*, 2014 WL 4929340 at *18–19 (D. Del. Sept. 29, 2014). The *Graphics* court found the term "high information content" was indefinite because "there [wa]s no standard in the specification for measuring what differentiates 'high information content' from 'information content'" and thus, a POSA "would be unable to separate textual information and graphic images that contain merely 'information content' from text and images that contain 'high information content.'" *Id.* at 19. Similarly, here, the specification provides no standard for distinguishing "propagation" from "fast propagation" and a POSA would

8

not know what speed of propagation constitutes "fast propagation." Thus, "fast propagation" is indefinite. *Id.*; *see also Intellectual Ventures I LLC v. T-Mobile USA*, Inc., 902 F.3d 1372, 1381 (Fed. Cir. 2018) ("'[O]ptimiz[ing] . . . QoS' is a 'term of degree' that, like the 'aesthetically pleasing' limitation in Datamize, is 'purely subjective' and depends 'on the unpredictable vagaries of any one person's opinion.'"); *Nexus Display Techs. LLC v. Dell Inc.*, No. 2:14-CV-762, 2015 WL 5578735, at *8 (E.D. Tex. Sept. 22, 2015) (finding "closely matching the auxiliary data rate" indefinite because a POSA "would not know whether data rate differences of 1–bit per second (bps) or 1–megabit per second (Mbps) are 'closely matching.'").

WSOU incorrectly argues that Defendants' agreements regarding certain means-plus-function terms "conflict" with indefiniteness. Br. 3–4; Ex. 3 (Agreed Constructions). There is no conflict. Defendants have consistently asserted that the term "fast propagation" is indefinite, and it is indefinite in every place that it appears in the claims. The parties were able to reach agreements regarding the identified function and structures for "means for fast propagation of link state information" and "means for fast propagation of node related information" only because the structures for those functions are ***explicitly defined*** in the specification:

> Means for fast propagation of node related information comprises means for fast propagation of link state information . . . . The means for fast propagation of node related information comprises a switching fabric and a link interface, wherein the link interface comprises a Fast Link State processor [] and a link failure database.

'921 patent, 3:23–30. Notably, while this disclosure clearly identifies the corresponding structure, it offers no information regarding how "fast" propagation must be, and fails to disclose any way to measure whether these functions have been met. Thus, the term is indefinite.

    2. <u>In the alternative, "fast propagation" at least requires propagation that is faster than OSPF</u>

To the extent the specification provides any guidance about the meaning of "fast propagation," it is only to convey propagation that is faster than propagation using OSPF through

9

the control plane. Indeed, the entire point of the '921 patent is to provide for a method of sending link state information faster than the "slow" prior art OSPF and control plane methods:

- "[T]he network recovery mechanism provided by the routing protocols alone such as *OSPF is too slow to satisfy the service needs of networks* that offer highly reliable services and are not acceptable in many practical situations." *Id.*, 2:63-67.

- "The described packet network providing fast distribution of node related information and a method therefor has the following advantage: *Using the FLSP processor performing FLSP function in the Data Plane* enables the reliable packet network of the embodiment of the invention to update Routing function in the computing means of the Control Plane, and *thus to provide forwarding of the link state information in the data plane <u>much faster than, e.g. by using OSPF routing protocol</u>*." 11:42–50.

- "The described packet network providing fast distribution of node related information and a method therefor has the following advantage*: By providing FLSP and database on each link interface* . . . and *broadcasting information through the switch fabric* to all link interfaces within the node simultaneously and forwarding to adjacent nodes simultaneously <u>*instead of* doing the LSDB and broadcasting in the *control plane, much faster distribution*</u> of node related information in the network is provided." *Id.*, 5:1–10.

*See also id.* at 2:9–24 (describing OSPF which "runs in the distributed control plane" as "slow").

Given these disclosures are the ***only*** guidance (albeit insufficient) for how fast "fast propagation" must be, this guidance must be part of any construction. WSOU's attempt to explain these passages away—arguing that these disclosures "merely discuss advantages over prior art methods" and do not provide any "requirement that the claimed invention be faster than the prior art" (Br. 3)—just confirms the inadequacy of this meager guidance and the indefiniteness of the term. Either these disclosures provide sufficient objective guidance and therefore limit the claims, in which case the claims should be construed to require speed faster than OSPF, or they do not, in which case the claims are indefinite. WSOU cannot have it both ways.

WSOU also argues that the use of the words "much faster" in Defendants' alternative construction are both a concession and provide less clarity than the claim language. Br. 3. Defendants used the term "much faster" because that is the ***only*** guidance (albeit insufficient) applicants provided for what "fast propagation" means; indeed, Defendants pulled that language

10

directly from the specification. *See* '921 patent, 11:42–53, 5:5–12. In any event, Defendants would not object to removing "much" from their alternative construction. The principal point is that if "fast propagation" is not indefinite—which it is—it must be given some objective boundaries, i.e., faster than using the computing means (*e.g.,* OSPF).

> B. **"data plane means for forwarding packets between the nodes" (Claim 1) / "data plane means for forwarding packets to other nodes in the network" (Claims 9 & 17)**

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| This term is subject to 35 U.S.C. § 112, ¶ 6. **Claim 1** *Function:* forwarding packets between the nodes *Structure:* Data plane 202 (distinct from the computing means) including switching fabric 214 and link interface 216; and equivalent structures **Claim 9 & 17** *Function:* forwarding packets to other nodes in the network *Structure:* Data plane 202 (distinct from the computing means) including switching fabric 214 and link interface 216; and equivalent structures | Subject to means-plus-function construction. **Claim 1** *Function*: forwarding packets between the nodes *Structure*: 4:44-60 (link interface 216 and switching fabric 214); and equivalent structures **Claim 9 & 17** *Function:* forwarding packets to other nodes in the network *Structure:* 4:44-60 (link interface 216 and switching fabric 214); and equivalent structures |

The only disputes regarding this term are (1) whether the "data plane means . . ." must be distinct from the "computing means . . ." and (2) whether the structure for "data plane means . . ." requires a data plane 202. The answer to both questions is yes. WSOU presumably wants to leave the term undefined so it can argue that as long as the claimed *functions* are performed it does not matter what structure is performing them.[5] That is contrary to the entire point of the patent, which is to propagate link state information in the data plane instead of in the control plane (which houses

---

[5] Despite the patent's **sole** focus on propagation in the data plane rather than the control plane, WSOU asserts this patent against Defendants' use of OSPF link state propagation in the control plane, identical to what the patent distinguishes. *See* Ex. 4 ('921 Infringement Contentions) at 5–8, 12–15, 19–22 (annotated); *Wilson Sporting Goods Co.*, 442 F.3d at 1327.

the computing means).

*First*, the claims themselves require that the claimed "computing means for control of the nodes" is distinct from the "data plane means . . ." by listing them as two separate elements. '921 patent, Cl. 1; *see id.* Cls. 9, 17. It is well-established that "[w]here a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention." *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010). Moreover, the claims explain that "the data plane means [is] responsive to control signals *from* the computing means" and the data plane means includes a means for fast propagation of node related information for "*forwarding* the information *to* the computing means in the network." '921 patent, Cl. 1; *see id.* Cl. 9, 17. It is clear that the computing means and data plane means *must* be separate structures in order to accomplish both of these limitations.

The specification is wholly consistent with that separation of data plane from the computing means (which is in the control plane):

> FIG. 2, showing a *division* of the network 1 *into a control plane 100 and a data plane 102*. . . . The Control Plane 100 shows the logical representation of the network, held in the data tables *of computing means 106* associated with each node (but not necessarily residing at the nodes), *and the algorithms running in the computing means 106*. *The data plane 102 shows the physical resources needed to process and forward packets*.
> \* \* \*
> FIG. 4 illustrates the structure of a node 170 having Control plane 200 and Data Plane . . . . [S]imilar to FIGS. 2 and 3 . . . the Control Plane 202 [*sic*] of FIG. 4 *includes a computing means (CPU) 206*, which provides operating and controlling of the node. . . . The *data plane 204* [*sic*] includes the switching fabric 214 and at least two link interfaces 216 (only one of them shown in FIG. 4).[6]

*Id.*, 1:27–37, 5:58–6:5. Thus, both the claim language and specification mandate a construction that the "data plane means . . ." requires structure distinct from the "computing means . . ."

---

[6] The specification contains two typos: the Control Plane should be labeled 200 and the data plane 202. *See* '921 patent, Fig. 4.

*Second*, it is axiomatic that the "data plane means" requires a "data plane." WSOU's attempt to *remove* the fundamental defining aspect of the "data plane means" by omitting the "data plane" from its definition is a transparent attempt to rewrite the claims. Indeed, WSOU's agreement that the corresponding structure includes the switching fabric 214 and link interface 216 (*see id.*, 4:44–46; Br. 3–4) is damning, as both of those structures are plainly contained within data plane 202 (*see* '921 patent, 6:3–4 & Fig. 4 (annotated below)):



As addressed above, the whole point of the '921 patent is to send link state information in the data plane rather than the control plane (which includes the computing means 206). Thus, the term "data plane means" must be construed to require a data plane.[7] As such, the Court should construe the structure for the "data plane means . . ." to include "Data plane 202 (distinct from the computing means) including switching fabric 214 and link interface 216; and equivalent structures."

---

[7] WSOU's assertion that data plane 202 includes other components is a red herring. *See* Br. 5; '921 patent, Fig. 4. Defendants construction only requires a data plane 202, including switching fabric 214 and link interface 216—it does not require any additional components, as such additional components are not tied to the identified function.

13

Dated:  March 17, 2021           By:   */s/ Barry K. Shelton*
                                       Barry K. Shelton
                                       Texas State Bar No. 24055029
                                       bshelton@sheltoncoburn.com
                                       **SHELTON COBURN LLP**
                                       311 RR 620, Suite 205
                                       Austin, TX  78734-4775
                                       Telephone:  512.263.2165
                                       Facsimile:  512.263.2166

                                       Benjamin Hershkowitz
                                       bhershkowitz@gibsondunn.com
                                       Brian A. Rosenthal
                                       brosenthal@gibsondunn.com
                                       Allen Kathir
                                       akathir@gibsondunn.com
                                       Kyanna Sabanoglu
                                       ksabanoglu@gibsondunn.com
                                       **GIBSON, DUNN & CRUTCHER LLP**
                                       200 Park Avenue
                                       New York, NY  10166-0193
                                       Telephone:  212.351.4000
                                       Facsimile:  212.351.4035

                                       Y. Ernest Hsin
                                       ehsin@gibsondunn.com
                                       Jaysen S. Chung
                                       jschung@gibsondunn.com
                                       **GIBSON, DUNN & CRUTCHER LLP**
                                       555 Mission Street, Suite 3000
                                       San Francisco, CA  94105-0921
                                       Telephone:  415.393.8200
                                       Facsimile:  415.393.8306

                                       Ryan K. Iwahashi
                                       riwahashi@gibsondunn.com
                                       **GIBSON, DUNN & CRUTCHER LLP**
                                       1881 Page Mill Road
                                       Palo Alto, CA  94304-1211
                                       Telephone:  650.849.5300
                                       Facsimile:  650.849.5333

                                       *Attorneys for Defendants*

14

## **CERTIFICATE OF SERVICE**

      The undersigned certifies that on March 17, 2021, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(b)(1).

                                                   */s/ Barry K. Shelton*
                                                   Barry K. Shelton