1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF TEXAS
2                             WACO DIVISION

3  WSOU INVESTMENTS LLC          *    May 10, 2021
                                 *
4  VS.                           *    CIVIL ACTION NOS.
                                 *
5  DELL TECHNOLOGIES INC. ET AL  *  W-20-CV-473 thru 482, 485, 486

6            BEFORE THE HONORABLE ALAN D ALBRIGHT
                      MARKMAN HEARING

7
   APPEARANCES:
8
   For the Plaintiff:        James L. Etheridge, Esq.
9                            Brett Aaron Mangrum, Esq.
                             Brian Matthew Koide, Esq.
10                           Jeffrey Huang, Esq.
                             Ryan Scott Loveless, Esq.
11                           Etheridge Law Group, PLLC
                             2600 E. Southlake Blvd., Suite 120-324
12                           Southlake, TX 76092

13                           Mark D. Siegmund, Esq.
                             Law Firm of Walt Fair, PLLC
14                           1508 N. Valley Mills Drive
                             Waco, TX 76710
15
   For the Defendants:       Barry K. Shelton, Esq.
16                           Shelton Coburn LLP
                             311 RR 620 S, Suite 205
17                           Austin, TX 78734-4775

18                           Benjamin Hershkowitz, Esq.
                             Brian Rosenthal, Esq.
19                           Kyanna Sabanoglu, Esq.
                             Allen Kathir, Esq.
20                           Venus Allahyarzadeh, Esq.
                             Gibson, Dunn & Crutcher LLP
21                           200 Park Ave.
                             New York, NY 10166
22
                             Jaysen S. Chung, Esq.
23                           Y. Ernest Hsin, Esq.
                             Gibson Dunn & Crutcher LLP
24                           555 Mission Street, Suite 3000
                             San Francisco, CA 94105
25
                             David Kuznick, Esq.

1                              Dell Technologies Inc.
                               176 South St.
2                              Hopkinton, MA 01748

3                              Ryan Iwahashi, Esq.
                               Gibson, Dunn & Crutcher LLP
4                              1881 Page Mill Road
                               Palo Alto, CA 94304
5
   Court Reporter:            Kristie M. Davis, CRR, RMR
6                              PO Box 20994
                               Waco, Texas 76702-0994
7                              (254) 340-6114

8        Proceedings recorded by mechanical stenography, transcript

9   produced by computer-aided transcription.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (May 10, 2021, 2:03 p.m.)

2          DEPUTY CLERK:  Markman hearing in Civil Actions

3    W-20-CV-473, 474, 475, 476, 477, 478, 479, 480, 481, 482, 485

4    and 486, styled WSOU Investments LLC versus Dell Technologies

5    Incorporated and others.

6          THE COURT:  Good afternoon, everyone.  If I could hear

7    from Mr. Siegmund and the plaintiffs, and then I'll hear from

8    whoever is going to be speaking on behalf of the defendants.

9          MR. SIEGMUND:  Good afternoon, Your Honor.  Mark Siegmund

10   for plaintiff WSOU Investments LLC.  With me today from the

11   Etheridge Law Group is Jim Etheridge, Ryan Loveless, Ryan

12   Koide, Jeff Huang and Brett Mangrum.  We also have two client

13   representatives with us today Ms. Sheyanna Pietras and Matt

14   Hogan.  Mr. Koide and Mr. Huang will be responding to any

15   arguments today, Your Honor.  Thank you.

16         THE COURT:  And welcome to your client representatives.  I

17   appreciate them being here.

18         Mr. Shelton, I see you.  I'm not sure if you are going to

19   be announcing, but if you are -- if you are, great.  If you're

20   not, then someone else needs to.

21         MR. SHELTON:  I get that honor, Your Honor.

22         THE COURT:  Very good.

23         MR. SHELTON:  Let me start off with our three client

24   representatives.  First Anne-Marie Dinius, then David Kuznick,

25   and Peter Jovanovic.  And then from the law firm of Gibson,

4

1   Dunn & Crutcher, we have arguing today three people, Brian

2   Rosenthal, Ben Kershkowitz and Ryan Iwahashi.  And then other

3   members from that firm who will not be arguing are Ernie Hsin,

4   Jaysen Chung, Allen Kathir and Kyanna Sabanoglu and Venus

5   Allahyarzadeh.

6        THE COURT:  Welcome to all of them.

7        My understanding is the first claim term, if I have this

8   right, is the -- the claim term is "V is a group identifier"

9   and goes on.  And I'm happy to hear from -- I'm assuming the

10  defendant wants to take this up, and because we gave plain and

11  ordinary meaning as our preliminary construction and the

12  defense proposed construction has what I might call a -- it

13  says plain and ordinary meaning but then has a definition of

14  what that is.  I'm happy to hear why that should be added.

15       MR. ROSENTHAL:  Thank you, Your Honor.  This is Brian

16  Rosenthal.  I'll kick off on behalf of the defendants if that's

17  all right.

18       First of all, I guess before we jump into that term, Your

19  Honor, I just had a couple of preliminary statements and

20  thoughts that sort of apply to all of the claim construction

21  issues.  First, we really do appreciate the time today and the

22  effort the Court went through.  One -- obviously we've read

23  your transcripts from other cases.  We understand, and I just

24  want to confirm on this record, that our decision to argue

25  certain things and not other things will not be held against

5

1  us, that we are preserving all of our arguments made in the

2  briefs.

3      THE COURT:  Let me say this.  I don't hold it against you

4  no matter what you do.  But I think what you're saying is that

5  as far as I'm concerned, the fact that you choose, I was going

6  to say wisely, but I'm going to use a much better word like

7  choose out of great sympathy for me or whatever to not feel

8  like you need to argue each of them, my position has always

9  been that Dell has articulated in their briefing what the

10  constructions are.  We've given you the preliminary

11  constructions.  If those are different than what you proposed,

12  then what you proposed is in the record and you are objecting

13  to what my preliminary constructions and ultimately my final

14  constructions are.  You just are choosing not to argue them

15  today, which I think, I will put on the record, is very wise

16  because it allows me to focus on the -- I think it's six terms

17  that the parties agree would be most benefitted by having oral

18  argument.  But I will -- but I -- certainly it is my opinion

19  that there's no, in my opinion, waiver of what -- that you all

20  proposed by the fact you didn't take the time during this

21  argument to hear it.  It's on the record, and if my

22  constructions are contrary to that, then it's over your

23  objection that they're being entered.

24      MR. ROSENTHAL:  Thank you, Your Honor.  That's exactly

25  what I wanted to clarify, and I very much appreciate that being

6

1   part of this record.

2         With respect to the terms for which the tentative

3   construction indicates plain meaning, I had a couple of

4   thoughts and questions with respect to those.  Obviously we

5   have the plaintiff's infringement contentions and we know from

6   our viewpoint that with respect to some of these patents, their

7   infringement contentions require and are premised on a claim

8   construction that is different from the plain meaning, and

9   that's why in some circumstances we are advocating for a

10  construction that --

11        THE COURT:  Mr. Rosenthal, let me interrupt you and say,

12  respectfully, that it's different from what you perceive the

13  plain and ordinary meaning to be.  So let me tell you basically

14  how I deal with this issue, and I was going to say this at some

15  point during this anyway if it saves you all time.

16        Look, I've tried to come up with an analogy.  I'm going to

17  try it out on you all, and ultimately if one of you tells me it

18  sucks, I'll try to do something else, but here's the way I see

19  the world.  Let's say that the invention has to do with a

20  method of laying the AstroTurf in a baseball field, and

21  included in it is the fact that the -- it's a way of doing it

22  because the outfield is round.  A baseball outfield is round.

23        So let's say that you get sued by people who make a

24  football field where it is clearly 90-degree angles.  They're

25  going to have a tough time under plain and ordinary meaning of

7

1    what round is in this situation.  But what I get more often

2    than that -- I don't get that very often.  What I do get, and

3    I'm making this up, because I really don't know how it works,

4    but I get someone who is doing a cricket field and they want

5    the argument to be over, is it round enough because it's like

6    the corners only bend in two degrees on each side, and that's

7    not round.  That's almost straight.  So that's not the plain

8    and ordinary meaning.

9        And in that situation to me that's plain and ordinary

10   meaning -- round has a plain and ordinary meaning.  Your

11   experts can come in and explain that it has that element or it

12   doesn't.  In a situation with a word like "round," I probably

13   would let the jury say, we think that that satisfies -- just a

14   two-degree pitch satisfies round for the purpose of that

15   element.

16       But another way I might handle this on -- and I try to

17   limit this maybe to one or two claim terms per case is when --

18   not just the preliminary claim -- I'm sorry.  Not just the

19   preliminary infringement contentions, but once you have the

20   infringement contentions, they'll come in a couple -- in a

21   little while.  And then once you have an expert report where

22   you have in your mind the equivalent of being sued for a

23   football field where it's a baseball field patent, you have a

24   couple of choices at that point because now the plaintiff has

25   taken a position that they can't retreat from very much.  You

8

1    could come in and say, Judge, we want you to look and see what

2    they have said "V is a group identifier corresponding to the

3    group of communication traffic," and as a matter of law, that

4    can't be the plain and ordinary meaning that they're using.

5        Or you can file a motion for summary judgment and say,

6    again, as a matter of law, this cannot be the plain and

7    ordinary meaning.  And it doesn't get it -- occasionally I'm in

8    the press, but something that hasn't gotten much press is I

9    think in almost every patent case that's gone to trial, I've

10    granted a motion for summary judgment of noninfringement on

11    something where the parties would come in on exactly this and

12    said, you know, it doesn't meet the plain and ordinary meaning

13    or something like that.

14        So typically in the absence -- and I know I'm talking a

15    lot, but hopefully it's helpful.  In the absence of you coming

16    in and saying to me that the reason this has to be the plain

17    and ordinary meaning is because they gave something up during

18    the prosecution that limits it to only this as the plain and

19    ordinary meaning, that's one thing that we don't, I don't

20    think, have here.  If the objection that Dell has at the moment

21    is that in your -- under your position there's no way what

22    they're saying is infringing could be the plain and ordinary

23    meaning, I very rarely, maybe never -- I mean, Mr. Siegmund and

24    Mr. Shelton have been on about 300 cases each of mine.  Maybe

25    they'll tell I've done it once.  I very rarely at the Markman

9

1    stage wade into that fight.  But I am very willing once you all

2    are further down the road -- and I always -- I say this also.

3    Mr. Siegmund's heard me say it probably 100 times.  It's really

4    up to both sides to decide, on this case the plaintiff, do we

5    get greedy on what plain and ordinary meaning means and try and

6    make it fit where it doesn't fit, or from the defense

7    perspective when you're doing your invalidity connections, do

8    you get greedy and say, we can -- this will be a reference we

9    can use when it, you know, might not really be spot on either.

10       So it's very rare I do anything beyond plain and ordinary

11   meaning for the reason that you're suggesting at this stage,

12   but I'm very aware that something where a plaintiff in this

13   case takes a position on plain and ordinary meaning that would

14   be unacceptable under the law ought to be addressed by me

15   initially before it goes to trial.

16       MR. ROSENTHAL:  That's incredibly helpful, Your Honor, and

17   I appreciate the detail and the explanation.  And that is

18   exactly where I was going to go with this.  So you've answered

19   all my questions there.

20       The last preliminary point that I wanted to say is this:

21   There are a number of circumstances in which we have urged a

22   meaning of a term and the response from the plaintiff has been,

23   well, we agree that's the plain meaning, but we don't mean need

24   to construe the term in that way.  I assume that given the

25   comments that you just made, if they deviate from that and then

1    they argue in their expert reports, actually, it's different

2    than what we said it was in our briefing that presumably that's

3    the vehicle for us to bring that to you is at that time.

4        THE COURT:  Well, that is one, but let me say this also:

5    You know, occasionally what I have as a result of something

6    like that is a defendant who believes -- again, here's the --

7    I'll give you another -- a real-world example.  Maybe the best

8    example.  Very early on I had one where there was an argument

9    over vertical pipe in an oil and gas case.  Now, that's not --

10   I mean, that's a concept that even Barry Shelton would be -- I

11   hope would be able to understand.  I had to help Mr. Shelton a

12   lot when we worked together on the hard technical things,

13   but -- and I understood why they were fighting because vertical

14   could mean 90 degrees or it might mean, you know, the Leaning

15   Tower of Pisa is vertical in some people's minds.  It's not

16   90 degrees, but at some point we would all agree that's not

17   vertical.  The fact that one side says 90 degrees is vertical

18   doesn't necessarily limit it -- that you were to say -- if you

19   said it has to be 90 degrees to be vertical and the other side

20   says, well, we agree that one at 90 degrees is vertical doesn't

21   necessarily mean they're saying that one at 86 degrees is not.

22       MR. ROSENTHAL:  Right.

23       THE COURT:  Again, I'm going to be the gatekeeper on this.

24   If we get far enough along, I'm going to be a gatekeeper and I

25   will be looking at it as a matter of law whether or not that --

1    what either side is contending depending on what their burden

2    is, it is in fact plain and ordinary meaning, but, again, in

3    that case -- it didn't go to trial, but in that case I almost

4    certainly would have allowed a jury of good people from Waco to

5    decide whether or not whatever it was accused of infringing was

6    in fact vertical pipe based on -- I was not going to construe

7    vertical pipe.

8        Now, here this is obviously -- you know, this is a more

9    complicated claim term than vertical pipe, but I'm again

10   letting you know that I understand my role as a gatekeeper.  I

11   just don't feel the Markman is the place to give a -- usually

12   to give a plain and ordinary meaning, but here's what it has to

13   be is the plain and ordinary meaning ruling.

14       Down the road if people -- people.  That's terrible -- if

15   parties take a position that in my opinion exceeds what the

16   plain and ordinary meaning would be, I can assure you I'm

17   very -- I'm very careful to make sure that I rule on that.

18       MR. ROSENTHAL:  Thank you, Your Honor.

19       So with those preliminaries, and thank you very much for

20   addressing them, I can jump right into the '144 patent.  I

21   don't know who has control, but I'm wondering -- oh, I have

22   control.  Never mind.

23       Can everybody see this slide that says '144 patent on it?

24   Is that coming through for Your Honor?

25       THE COURT:  Yes, sir.

1        MR. ROSENTHAL:  Okay.  Thank you, sir.

2        Okay.  So I'm not going to spend a lot of time on the

3   background here.  I'm just going to cut right to the chase.  I

4   am going to just spend one moment to set the context for this

5   term.  And I should say, you know, obviously there's a lot of

6   stuff that we wish we had gotten construed differently in the

7   tentative, as is always the case.  We really selected the

8   handful that we selected because these are ones that we really

9   do think that walking through some of the evidence will help.

10  We're very conscious of the idea that we're not just trying to

11  beat our heads-up against the wall here, but we do think that

12  some of these do warrant some discussion.

13       Really quickly, what this patent is all about is taking

14  groups of communication traffic and assigning them among

15  various paths that you can go through a network.  So here

16  there's -- if you're going from A to B, you've got, I don't

17  know, six different paths.  You can go one, four, two, three,

18  four different ways you can get from A to B.  And in this

19  scenario they're all lowest cost paths, and so what this patent

20  is concerned with is how do I allocate traffic to those lowest

21  cost paths?  How do I split that traffic?

22       And the way that this patent does it is with this formula

23  V mod N.  And V mod N is very specific.  It's written in the

24  claims.  And the way that the claims talk about it is that V is

25  an identifier that identifies in the examples of the patent a

1   VLAN, for instance, stuff that you want to keep together on the

2   same path.  So a VLAN is a good example and what the patent

3   talks about.

4       You then take that V number and you subject it to a modulo

5   operation.  Modulo operation just results in the remainder when

6   you divide a number by a number.  So 3 mod 2 is one.  So

7   because you divide three by two, you're left with a remainder

8   of one.

9       So the patent talks about taking this V number, the group

10  of communication traffic identifier, modding it by the number

11  of paths.  In this particular example there are nine paths to

12  get from C to D, and go -- I'm not going to walk through them

13  all, but you can see there's lots of different colored paths

14  that you can go through.  And you use that modulo operation to

15  assign each one to a path.  And that's this V mod N formula.

16      So now let me get right into what is the V in the V mod N.

17  So according to the claim, V is a group identifier

18  corresponding to the group of communication traffic.

19      Now, this is a case where -- and you mentioned this

20  earlier, Your Honor, that you didn't think that this was a case

21  where they gave up subject matter during prosecution.  We think

22  differently, but I wanted to just walk through that prosecution

23  history to make, at least in our view, the case that not only

24  did they surrender subject matter.  They did so deliberately

25  and repeatedly and clearly in two different places in the file

1   history.

2        So in our view -- they went to the Patent Office.  They

3   had a piece of prior art that was super close.  They

4   distinguished it on the basis of this V limitation, and they're

5   bound by that.

6        And, Your Honor, the key -- the reason -- it probably is

7   no surprise -- the reason that we're so focused on this is that

8   they are now in a situation where they are accusing of

9   infringement exactly the same thing, exactly the same thing

10  that they distinguished during prosecution.  And so it's our

11  view that it is indeed the role of the Court at claim

12  construction, not on summary judgment, but at claim

13  construction to look at those statements that were made during

14  the file history and give effect to them by limiting the scope

15  of the claim.

16        So I want to just walk Your Honor through the two places

17  in the file history.  This is the actual evidence that we rely

18  on.  So they were faced with a rejection --

19        THE COURT:  Mr. Rosenthal, let me let you know that

20  something I'm doing more of now -- and I'm giving heads-up to

21  the other side is when you finish this part of this argument,

22  I'm going to ask plaintiff to respond just to this one argument

23  and have you resume, but I found I do better now if I break it

24  up and actually let people kind of go back and forth on

25  specific issues where I can follow it a little better.  So

1   whenever you're done making this point with regard to where you

2   think they gave up some rights, let me know, and I'm going to

3   let there be a response just with -- literally with respect to

4   what you're showing me and then you'll get the camera back.

5       MR. ROSENTHAL:  Absolutely.  And, Your Honor, I've got two

6   pieces of prosecution history that say very much the same

7   thing.  So my sense is I ought to do both of those and then

8   give up the mic unless you wanted to do sort of one piece and

9   then the other.

10      THE COURT:  No, no.  Both will be fine.  I can keep up for

11  that long.

12      (Laughter.)

13      MR. ROSENTHAL:  Okay.  I hope I can as well.

14      All right.  So what happened is the applicant was faced

15  with a rejection over this reference called Matthews.  Matthews

16  is a -- I think it's a Qualcomm reference, and basically it

17  does everything that's in the claim, but the way that it does

18  its routing is it uses a half value on the packet.  So every

19  packet has certain fields in it, including where does it come

20  from and where is it going?  Source and destination address.

21  And what Matthews does it does a hash of that, which is just a

22  mathematical formula on the bits in those so that if you have

23  two different packets that came from the same place and are

24  going to the same place, you'll get the same hash value.

25  That's the idea.

1          And then what Matthews says is, we can just take that hash

2     value and modulo the number of available paths and that's how

3     we're going to assign traffic.  Exceedingly similar to what's

4     written in the claims, except for one thing.  Only one thing.

5     What the applicant said is -- and this is the first but not the

6     last time that the applicant says it.  At the top of this slide

7     in the July 17 response, in particular, while the cited

8     portions of Matthews may mention a modulus application, the

9     modulus operation is merely performed on a hash value to obtain

10    the path ID.

11         And then the applicant goes on to then make another

12    argument as to why Matthews is distinguishable, but clearly

13    they're distinguishing in the initial instance Matthews on the

14    basis that the modulus operation is performed on a hash value,

15    not on a V which is the identifier of the group of

16    communication traffic.

17         Now, what happened in the file history was the examiner

18    came back and said, well, it's clearly taking that modulo

19    operation and the results and associating it with a path ID, so

20    the rest of what you said doesn't hold any water.

21         And then the applicant came back again in response to that

22    rejection, second rejection, and repeated the first argument

23    and emphasized the first argument.  So this November applicant

24    response is really damming, in our view, and killing.

25         So first of all, the language that the applicant is

1   referring to is identical to what's under construction.  V is a

2   group identifier corresponding to a group of communication

3   traffic.  And it says -- the applicant says that while the

4   Office Action relies on Matthews, Matthews does not teach or

5   suggest that limitation, and they underlined that limitation.

6       So they are clearly distinguishing prior art on the basis

7   that it does not teach the limitation that is under

8   construction here:  V is a group identifier corresponding to a

9   group of communication traffic.

10       This next slide which is just the continuation, it's just

11   the next plaintiff, we just broke it up into two slides, of the

12   November 8, 2014 response is where the rubber meets the road.

13   So here they are clearly making a distinction.  They are

14   saying, the cited portions of Matthews merely performing modulo

15   operation on a hash value -- that's the hash value I was

16   talking about -- and then it continues and says, the hash --

17   I'm just going to read what's in highlights -- the hash value

18   in Matthews does not correspond to a group of communication

19   traffic.  Instead, it corresponds to a source address or a

20   destination address, and then they quote Matthews which says

21   that you perform a hash function on the fields of the packet

22   such as the source and the destination address.

23       And then it goes on:  The source and destination address

24   to remotely suggest traffic, let alone a group of traffic.

25   They merely indicate an address of a network device.

1          So here we have a situation where there is broad language

2     in the claim.  V is a group identifier to identify a group of

3     traffic.  The examiner thinks, well, hey, I've got a hash

4     value.  That's a group of traffic.  And there's a clear

5     disclaimer where the patent applicant says, no.  That is not --

6     it's a hash value based on address fields.  That's not the same

7     thing.  And to explain that, if you think about a packet, just

8     because packets are coming from the one network location and

9     going to the same network location doesn't mean they're in a

10     group.  That's the point that the applicant is making.

11          So our claim construction -- I'm going to go back to

12     Slide 8 where we identify what the claim construction should

13     be.  Our claim construction is ripped like verbatim from that

14     November 2008 -- I think it's 2008.  Sorry.  November 2014.

15     From that November 2014 argument where we say the group

16     identifier cannot be a hash value based on packet fields such

17     as source address and destination address.  And the reason

18     that's true is because that very subject matter was clearly and

19     unequivocally disclaimed and distinguished from the claims, and

20     it is only that reason that the claims got allowed.

21          So allowing the plaintiff here to avoid the impact would

22     basically be to allow the applicant to go the Patent Office, to

23     distinguish the claims on the basis of a reading of the claims

24     and exclude this type of hash value and then for them to ignore

25     all that, come to court and accuse literally, literally the

1    same thing.  What our product does is the same thing.  And this

2    is the time at claim construction to give effect to those

3    prosecution history disclaimer arguments.

4        So that's a good pausing place, Your Honor.

5        THE COURT:  Thank you, sir.

6        A response to that point?

7        MR. KOIDE:  Good afternoon, Your Honor.  This is Brian

8    Koide.  Can you hear me?

9        THE COURT:  Yes, sir, Mr. Koide.  Welcome back.

10       MR. KOIDE:  Thank you, Your Honor.

11       I guess as a preliminary comment, we want to thank Your

12   Honor and Your Honor's staff and also including the technical

13   advisor for all the hard work he put into these matters.

14       The just broad brush, Mr. Rosenthal's arguments just now

15   are repetitive of what's in the brief.  I don't want to

16   regurgitate our arguments, but we're largely going to stand on

17   our briefs.

18       I would note that the July amendment that Mr. Rosenthal

19   first addressed, we addressed primarily in our opening brief,

20   that was the focus of Dell's motion to dismiss on this matter.

21   They attempted to change horses a little bit and switch to the

22   November amendment.  We've addressed that in our reply on Pages

23   5 and 6.

24       But at bottom, there's no clear disavowal here.  As we

25   noted in our briefs, we believe they're misreading the

1   prosecution history.  And also, you know, it's -- none of these

2   statements arise to the legal standard of a clear disavowal of

3   any claim scope.

4       So unless Your Honor has any questions, I'll just leave it

5   at that because we of course agree with Your Honor's

6   construction and we don't want to be too repetitive of the

7   arguments in our briefs, but we stand on the arguments made in

8   our briefs.

9       THE COURT:  That's very good.

10      I'm happy to hear the rest of the defendants' argument.

11      MR. ROSENTHAL:  Yes, Your Honor.

12      The only thing that I would add, and it has to do with

13  these two different amendments.  It is true that there are two

14  different amendments.  The fact that there are two different

15  arguments -- not amendments.  I'm sorry -- arguments in the

16  file history that say exactly the same thing that say Matthews

17  mentions a modulus operation but it's not performing a modulus

18  operation on what we have claimed.  We have claimed a group

19  identifier and a hash value based on the source and destination

20  address is not a hash group identifier.  They say it twice in

21  two different arguments to gain the claims.  We haven't changed

22  horses.  It's the same argument two different places.

23      So we do think that this is a clear and unmistakable

24  disclaimer.  In fact, so much so that it's hard to imagine what

25  would be a clear and unmistakable disclaimer.  Here you have a

1    piece of prior art that discloses a technical feature, namely,

2    taking a hash value on source and destination address and

3    taking a modulo from that value and the applicant says, that's

4    not my claim.  My claim requires a group ID, not a hash value

5    on those two packet header fields.  So we're not arguing let's

6    extend that to something else that wasn't disclaimed.  We're

7    not arguing, well, then it has to -- you know, there's broad

8    range of what has been disclaimed.  We're literally asking the

9    Court to give effect to the very language of the distinction

10   that was made over that very technique because it is that very

11   technique that is being accused of infringement in this case,

12   and what we worry about is that we -- this is a pure matter of

13   claim construction.  This is a matter of pure claim

14   construction disclaimer, and of course we'll address this in

15   summary judgment if indeed they raise an argument that is in

16   conflict with the file history, but this is a situation where

17   the file history provides that clear and unmistakable

18   disclaimer, and when you look at those briefs upon which the

19   plaintiff has just stood, in no way do any of those briefs

20   actually address why this isn't a clear and unmistakable

21   disclaimer.  Typically what I would see in a brief like that

22   is, what else could it mean?  Maybe this is the basis on which

23   they were distinguishing the prior art.  Maybe it was something

24   else.  None of that is there.  What's here in black and white

25   on the screens that we've shown and in the file history is a

1    clear distinction over the prior art, and they don't have an

2    answer for it other than to say conclusorily we don't think it

3    rises to the level.

4        That is all we had on this term, Your Honor.

5        THE COURT:  Mr. Koide, anything else?

6        MR. KOIDE:  No.  Nothing, Your Honor.  Again, we stand on

7    our briefs.  Again, this is -- just to highlight for Your

8    Honor, this isn't the -- Dr. Yi's e-mail suggested that the

9    parties might want to take a different position.  Dell is

10   taking the same position they took in their briefs.  So again

11   we'll stand on our briefs on this one.

12       THE COURT:  I'll be back in a few seconds.

13       MR. ROSENTHAL:  Thank you, Your Honor.

14       (Pause in proceedings.)

15       THE COURT:  The Court is going to go back on the record,

16   and I'm going to maintain for that claim term the plain and

17   ordinary meaning.

18       The next claim term is bridge, and I might suggest that

19   when I was speaking earlier and I was trying to come up with

20   claim terms where I think they kind of a plain and ordinary

21   meaning themselves in the future, bridge is one I might use

22   when I'm trying to explain these things, but I'm happy to take

23   up -- I understand Dell wants to take up and argue why a bridge

24   in this case for the '536 patent might have to be a network

25   interface device that operates no higher than the data link

1   later.

2        I'm not sure who's going to speak for Dell, but I invite

3   them to do so.

4        MR. ROSENTHAL:  Your Honor, if I could just make one

5   statement about that.  We're not going to argue bridge today in

6   view of the comments that you made earlier today which we fully

7   understand and appreciate.

8        I think we'll rest on the arguments we made in our brief

9   with respect to bridge, and what we'd like to do is move on to

10  the next term which is the forwarding system term in the '536

11  patent.

12       THE COURT:  Mr. Rosenthal, I'm going to -- you all are,

13  because I've dealt with all of you, much, much better trial

14  lawyers than I could ever hope to be.  That's why I had to take

15  this federal job, but I will give you all a free bit of advice

16  that -- based on what you just said.  If I were to ever go back

17  and be a trial lawyer again, and I never will.  I have

18  nightmares where I wake up and I've gone back to being a trial

19  lawyer and I can't figure out why.  But if I were, I think

20  every single time I were arguing something or doing something

21  in front of the jury, whenever I finished with whatever I was

22  going to do, I would say, Your Honor, I have a little bit more,

23  but I'm just going to give 15 minutes back to the jury and then

24  sit down because there's nothing that makes anyone happier than

25  doing that.  That's my free advice to you all today.  It's what

1    I would do going forward.

2         (Laughter.)

3         THE COURT:  So I will maintain the plain and ordinary

4    meaning for bridge, and we will move on to the claim term that

5    begins with "forwarding system configured" and goes from there.

6         MR. ROSENTHAL:  Well, I will give back the hour that we

7    were going to devote to bridge to you.

8         (Laughter.)

9         THE COURT:  Well played.

10        MR. ROSENTHAL:  And Ryan Iwahashi, who's an associate in

11   our office in California, is going to address the forwarding

12   system term.  So I'll turn it over to him.

13        THE COURT:  Very good.

14        MR. IWAHASHI:  Good afternoon, Your Honor.

15        THE COURT:  Is this your -- have you -- I don't think

16   you've appeared in front me yet, have you?

17        MR. IWAHASHI:  I have not.

18        THE COURT:  I wanted to welcome you.  I appreciate you

19   being here today and I look forward to hearing from you.

20        MR. IWAHASHI:  Thank you, Your Honor.

21        Brian, do you mind giving me control of the screen?

22        MR. ROSENTHAL:  There you go.  You should have it now.

23        MR. IWAHASHI:  Great.  Thanks.

24        So, Your Honor, for this next term for the '536 patent it

25   starts out "forwarding system configured to," and it's directly

25

1    applicable to Claim 1.  I'm not going to go through and repeat

2    all the arguments from the briefs, but I would like to walk

3    through this Court's November claim construction order in the

4    Huawei v. Verizon case that found a strikingly similar term was

5    governed by Section 112(6).  And the reason I want to do that

6    is because I don't think it came across in our briefs just how

7    similar these terms really are.

8        So starting with the claim language at issue here, which I

9    have up on the screen on Slide 18, it states:  A forwarding

10   system configured to, and then it recites three functions.  So

11   the first one is read a priority of a data frame; the second is

12   identify a surface interface based on that priority; and the

13   third is forward the data frame over the channel associated

14   with that service interface.  So that's reading, identifying

15   and forwarding.

16       And these are clearly the functions that the forwarding

17   system is configured to perform.  There is no structure that

18   comes from the reading, identified and forwarding functions.

19   This means that any alleged structure for this claim term must

20   come from the forwarding system configured to part of the term.

21   And just like forwarding module configured to in Huawei, there

22   is no such structure.

23       So I want to turn now to Slide 19 which has the claim

24   language from the Huawei term and take a closer look.  So in

25   Huawei, as I mentioned, it recites "the forwarding module

1    configured to."

2        Then the claim continues and recites two functions that

3    the forwarding module is been configured to perform.  The first

4    is:  Select one or more tunnels, and the second is forward

5    service over the selected tunnels.  Those two functions are

6    remarkably similar to the functions at issue here, which are

7    read a priority and identify a service interface and then

8    forward the frame.

9        So both here and in Huawei the claims recite forwarding

10    system or a forwarding module configured to and then very

11    similar functions.  And here it's, read and identify, and

12    Huawei was select, and then they both recite forwarding based

13    on what was selected or identified.

14        There's no relevant difference between the term "module"

15    and the term "system."  Just like a module system is a nonce

16    word or a verbal construct, it does not connote sufficiently

17    definite structure.  Indeed, this Court has held the term

18    "system" is a nonce term multiple times, including in Dyfan and

19    Joao Control.

20        In Dyfan this Court specifically said that it would be

21    incorrect to presuppose that the term "system" has structure.

22    And here there are no structural components of the claim

23    forwarding system.  And none should be presupposed, given that

24    it's using a recognized nonce word or verbal construct that is

25    tantamount to using the word "means."

1      The word "forwarding" in this -- in the claim term simply

2  describes the function of the system, not any specific

3  structure.  And the same is true of the forwarding module in

4  Huawei.

5      So I want to briefly touch on the fact that even if you

6  were to look into the specification for the structure of the

7  claim forwarding system, the only mention, the single mention

8  of forwarding system in the specification which is up here on

9  Slide 21, just parrots the exact same language from the claims.

10  In other words, there is no structure that is associated with

11  the forwarding system in the specification or in the claims.

12      So just like the "forwarding module configured to" in

13  Huawei, here "forwarding system configured to" in Claim 1 of

14  the '536 patent should be subject to Section 112(6).  This term

15  is indefinite because as one of the three recited functions,

16  which is reading priorities, is the same function that this

17  Court found lacks corresponding structure in its tentative for

18  a different term.  So we, therefore, respectfully ask the Court

19  to reconsider this term in light of the analogous term in

20  Huawei.

21      Thank you, Your Honor.

22      THE COURT:  If you all will give me just one second, I'll

23  be right back.

24      (Pause in proceedings.)

25      THE COURT:  So I'm happy to hear -- I'm obviously happy to

1    hear from counsel for plaintiff, but what -- and whatever you

2    plan to argue would be great, but I think what would be most

3    helpful to me is -- are the two things -- first is, is there a

4    meaningful difference between the word "module" and the word

5    "system" that's used in this patent as opposed to the patent

6    that we were talking about that we -- the Court dealt with

7    earlier.  And the second is any differences there are in the

8    amount of structure that's disclosed in the claim in that prior

9    patent that we dealt with at Markman and the one here with

10   regard to any impact it has on a means-plus function claim,

11   those are the two things I care about.  You're free to chat

12   about whatever you want, but those are the two things I hope I

13   hear covered by the plaintiff and then I'll be happy to hear a

14   response from counsel for the defendant.

15       MR. HUANG:  Okay.  Thank you, Your Honor.  Jeffrey Huang

16   for plaintiff.

17       I don't have the other patent and, you know, those

18   briefings from the Huawei handy, but I will just note

19   defendants are trying to compare completely different patents

20   with different specifications and different claims, and I just

21   don't think you can make a comparison of one to one like that.

22   The specifications clearly are not the same.  They're not even

23   the same family of patents.

24       But to try to kind of answer Your Honor's question, I

25   think there's -- I mean, we -- well, let me put it this way.

1   We reserve our arguments on our briefs in the Huawei case too.

2   We disagree with Your Honor's preliminary there, but here we

3   have in terms of a forwarding system clear structure, and

4   that's recited in the specification.

5       First -- and, again, this is all in our briefs, but first

6   at Column 3, Lines 53 to 62, and I'm going read part of it, not

7   that whole section.  It says that bridge 16 comprises an

8   Ethernet card 20.  And then it goes on to say, bridging system

9   27 is on Ethernet card 20.  And then bridging system 27

10  comprises a plurality of bridge ports by way of which data can

11  be sent and/or received.  So that's forwarding.  You can -- you

12  can send data -- well, also receive, but receive send data you

13  can forward.

14      Another example of this, again in our briefs, is at Column

15  4, Lines 26 through 35 where it says bridge 16 receives packets

16  from a connected LAN segment 12 at local interface 23 which is

17  connected to a first bridge port 25.

18      But then it goes on to say, bridge port 25 may implement a

19  set of service queues which handle the forwarding packets --

20  forwarding of packets having different user priorities on to

21  LAN segment 12.

22      So here we have some examples, not all of them, but just

23  some of the examples of the definite structure for the

24  forwarding system.  And I think, you know, the patent makes it

25  very clear.  It claims the bridge as a device and then breaks

30

1   the bridge down into plenty of components within that bridge.

2       And then finally as to -- well, WSOU agrees with Your

3   Honor that this is not a 112(6) term, but even in the extent,

4   you know, we -- for that one function that defendants identify,

5   if there is some requirement to show an algorithm, that is here

6   as well, because, again, this is Column 5 Lines I guess 28

7   through 40 or so, it says:  Data packets on each LAN segment 12

8   may be associated with a user priority.  For example, VLAN tag

9   and priority tag Ethernet frames have a header which includes a

10  three bit user priority field.  The user priority field can

11  hold values in the range of zero through seven.  And it goes

12  on, describes how to -- you know, what those values mean but

13  also -- it also includes the user priorities may be assigned,

14  for example, in accordance with Appendix H of IEEE

15  Specification 802.1D which it clearly identifies as an existing

16  standard for user priorities and reading and assigning user

17  priorities.

18      So unless Your Honor has a more specific question for me,

19  I hope I answered Your Honor's question.  I have nothing

20  further.  And we just rest on our briefs for the rest.

21      THE COURT:  No.  Thank you.

22      And response from counsel for Dell?

23      MR. IWAHASHI:  Thank you, Your Honor.

24      So I heard a couple of points from WSOU's counsel, and I'd

25  like to address both of them separately.

1          First, they argue that this is a separate patent and with

2     a separate disclosure, and, you know, obviously these are

3     separate patents, but the claim language itself "forwarding

4     system configured to" and "forwarding module configured to"

5     with two nearly identical functions are highly similar, and it

6     would be hard to imagine that it's not at least instructive as

7     to the type of term that should be subject to 112(6).

8          I would actually argue that there is more disclosure in

9     the Huawei patent in the specification than there is here on

10    forwarding module.  I already showed the specification.  The

11    only mention of forwarding system in the specification

12    previously -- and let me go ahead and share the -- from the

13    '986 patent, which is entered in Huawei, this picture which

14    depicts a forwarding module and has corresponding disclosure as

15    well.

16         The second point I wanted to address is the notion that

17    the bridging system can somehow provide corresponding structure

18    or structural support for the separately claimed forwarding

19    system.  We're not up here trying to argue that the bridging

20    system lacks the corresponding structure.  The bridging system

21    actually is disclosed in Figure 2, bridging system 27.  It

22    provides some structure for it.  That's not the term at issue

23    here.  That's not what's claimed.  What's claimed here is the

24    forwarding system which doesn't have corresponding structure.

25         Going to the structure of the claim, Your Honor, it talks

32

1    about a bridge having a plurality of bridge ports, and then

2    separately and later on it talks about the forwarding system,

3    implying a separate structure needs to be there, something

4    separate within the data handling apparatus should be structure

5    for the forwarding system.

6        The -- in NTD the Federal Circuit made clear that although

7    the specification certainly plays a role in assessing whether a

8    particular claim language invokes Section 112(6), there are two

9    distinct inquiries:  One, whether the claimed limitation

10   connotes sufficiently definite structure; and, two, if not,

11   whether there's a corresponding structure in the specification,

12   and, as the Federal Circuit reasoned, if any corresponding

13   structure in the specification that the claim was not subject

14   to Section 112(6), there would never be a means-plus function

15   term with the corresponding structure.  That can't be the case

16   here.  Like not only is there no corresponding structure for

17   forwarding system in the spec, but even if there was, that

18   doesn't necessarily mean that this limitation is not subject to

19   Section 112(6).

20       So with that, Your Honor, thank you for your time on this

21   term.

22       THE COURT:  Thank you.  You did a great job.

23       Anything else for plaintiff?

24       MR. HUANG:  No, Your Honor.  We just rest on our briefs.

25       THE COURT:  I'll be back in a few seconds.

1          (Pause in proceedings.)

2          THE COURT:  If we could go back on the record.

3          The Court is going to maintain its construction of plain

4    and ordinary meaning.

5          The next claim term is "processing unit for setting the

6    internal Port Path Cost," and I'll hear from counsel for

7    defendant.

8          MR. ROSENTHAL:  Thank you, Your Honor.  This is Brian

9    Rosenthal again.  I'm going to handle that term.  I'm happy to

10   handle the terms in any order.  I want to make sure we didn't

11   miss the '888 term.  Is that on your list just for later?

12         THE COURT:  Woops.  I just scrolled down one too far.

13   Thank you for letting me know.  Let's go back.  This one should

14   be, wherein the selection and association.  I just rolled down

15   too far.  I apologize.

16         MR. ROSENTHAL:  No problem.  I was handling both.  So it

17   doesn't matter to me, but I just wanted to make sure we didn't

18   miss something.

19         THE COURT:  Well, this one must be easier than the last

20   one if they're giving it back to you.

21         (Laughter.)

22         MR. ROSENTHAL:  Exactly.  They give me the ones that I can

23   handle.

24         (Laughter.)

25         THE COURT:  You know, early on doing this, I had a young

1   lawyer who stepped up, and I thought I was being quite funny

2   when I said "they must really hate you if they gave you this

3   claim term," and he almost passed out.  So I've never -- I've

4   tried to avoid doing that too much since then.  So I figured

5   you would be able to handle it.

6        MR. ROSENTHAL:  I'm all right with that.  I'll take it.

7        All right.  Thank you, Your Honor.

8        So let me -- I'm not going to repeat the long phrase.  Let

9   me just take control back of the device here.  Hang on one

10  second.

11       Okay.  So are you seeing now my slide show that says the

12  '888 patent?

13       THE COURT:  I am.  Yes, sir.

14       MR. ROSENTHAL:  Okay.  Thanks, Your Honor.

15       So I want to take just a moment -- this is a dense patent

16  to say the least.  There's a lot of jargon in this patent.  And

17  I'm actually pleased that the parties have been able to narrow

18  the number of disputes down to what we have.  But I want to

19  just take a moment because the file history in this patent is

20  really strange.  And the term that we're arguing and the

21  construction that we're proposing comes verbatim from repeated

22  arguments that were made in the file history, but it's not

23  intuitive at all.  And so I thought that this one might benefit

24  from just a little bit of slowing down on exactly what's going

25  on here.

1           This patent builds on a concept of having VLANs that go

2    over trunks in a network.  And in particular on our Slide 31,

3    this is a colored version of Figure 3 of the patent.  I think

4    we put too many colors on it because now it looks more

5    complicated, but the idea here is that inside this inner cloud

6    is what's called the core network.  It's called the service

7    provider's core network.  I don't know.  Can you see my mouse

8    when I move it around like that?

9           THE COURT:  Yes, sir.  I can.

10          MR. ROSENTHAL:  So this -- inside this interior cloud is

11   the service provider's core network, and what it talks about is

12   you've got these trunks that go in between the core routers

13   which are called CR.  In between the core routers are these

14   trunks which are called backbone VLAN trunks.  They're called

15   backbone VLAN trunks because it's all inside the core of the

16   network.

17          And what the patent talks about is you can take VLANs that

18   attach to the exterior part of the network and you can route

19   them over the interior part of the network over these backbone

20   VLAN trunks.

21          And, now, here's where the real rub of the patent is.

22   What it says is basically this:  You're making assignments --

23   you see here this orange where it says this VLAN20, VLAN30?

24   Those are called backbone VLAN IDs.  And what it's saying in

25   the patent is you assign these backbone VLAN IDs to trunks, and

1    you do so irrespective of whether the trunk is an active link.

2    So in this picture the active links are solid, and the

3    inactive, the backup links are dashed.  And so you see that

4    inactive link has a VLAN20 and the active link has a VLAN20,

5    and that's what the patent describes as what's new.

6        The patent says, so what's new about this patent is we're

7    going to assign backbone VLAN IDs irrespective of whether the

8    trunk is an active, like it's a solid, or it's dashed,

9    inactive.  We're still going to assign.  And the reason for

10   that is if you ever have to change links because one link goes

11   down, you got to switch to an inactive link, it's already got

12   its VLAN assignment.  You don't have to redo that process.  So

13   that's what the patent is talking about.

14       The problem is -- now I'm going to go to the file history.

15   The problem is the applicant was faced with a rejection over

16   this reference called Gai, G-a-i.  And I've got this on my

17   Slide 35.  It's an exhibit to our papers.  Exhibit No. 12 to

18   our papers.

19       And the Gai reference discloses exactly what was claimed

20   in the patent.

21       And the examiner -- so on the right side of the screen

22   here is what the examiner's saying in his final rejection.

23   What he's saying is, look.  I've got a chart from Gai, and it's

24   assigning the backbone VLAN ID which is red, blue, yellow,

25   green.  It's assigning that VLAN ID to these physical VLANs

37

1    which are the trunks, and it's doing so regardless of whether

2    the state of that trunk is active or standby, because it's

3    making this assignment regardless.  This is exactly what the

4    patent described.

5         So here is where there was a clear and unmistakable

6    disclaimer.  And this is -- Your Honor, this is one where, you

7    know, sometimes there's a distinction over the prior art, but

8    you're really distinguishing using the plain language.  So, you

9    know, there's no real need to put that into the claim.  That's

10   what the distinction was.  This is not that situation.  This is

11   a situation where the applicant used a really tortured, really

12   tortured meaning of this phrase to distinguish this very close

13   piece of art.

14        So I just want to -- we quoted this in the brief, but I

15   just want to actually show the file history just so that Your

16   Honor can see how frequently this argument was made.  So the

17   examiner rejected the claims over the Gai reference, and three

18   separate times the applicant distinguished it.  So the first

19   time was in '07, October 19th.  And what it says is, Claim 1

20   requires that you do this association irrespective of an in

21   user standby, and it says, Gai is contrary to the limitation of

22   Claim 1 because each logical VLAN deliberately has one active

23   and a number of standbys.

24        So what is he saying?  He's saying, because you're

25   actually deliberately assigning one of these trunks to be

38

1    active and others to be standby, you're not ignoring those

2    designations.  So he says the association cannot be said to be

3    irrespective of whether the trunk is in use or standby.  In

4    fact, and this is the real nub of this, he says, in fact, if

5    Gai's association was irrespective, the method would not work

6    because the whole point of Gai is to have one in use and

7    multiple standby physical VLANs.

8         So that is a clear and unmistakable disclaimer.  It's a

9    clear and unmistakable statement of what the claim requires,

10   and if that were all that were here, that would be enough.  But

11   the examiner did not buy this.  The examiner came back and

12   said, no, no, no.  I really think Gai discloses this claim, and

13   he repeated the same argument.

14        So the applicant said it again in 2008, April 8th.  The

15   applicant made the same substantive argument with different

16   words, underlining different things, and said, because each

17   logical VLAN deliberately has one active and a number of

18   standbys, the association cannot be said to be irrespective.

19   And then he repeats the argument that if that -- if it were

20   done irrespective, Gai would not work.  So that's the second

21   time that he made this argument.

22        The examiner again disagreed and the examiner again said,

23   look at Gai.  I can see that it's assigning VLAN IDs regardless

24   of whether it's a active or in use.

25        And then the applicant for a third time makes this

1   distinction which is June 9 of 2008, and this time he really

2   gets explicit, and this to me -- if I were writing a textbook

3   on how to identify clear and unmistakable disclaimer, it would

4   be with this kind of an example.  He actually has definitions

5   in here.  So what he says is, regarding the term "irrespective"

6   as argued extensively, Gai does not teach this limitation --

7   this is exactly the one that's under construction -- of

8   irrespective of an in use and a standby designation.

9       And then the applicant says, examiner, you are not

10  considering the proper definition of irrespective.

11  Irrespective means regardless of, independent of, without

12  regard to, in other words, the association of a backbone VLAN

13  ID with a corresponding plurality of backbone trunks is carried

14  out without any consideration of whether it is designated as in

15  use or standby.  No consideration.

16      And then he goes on and he says, the backbone trunks may

17  already have a designation, but the provisioning methods of the

18  present claims ignore those designations when associating the

19  VLAN IDs with the trunk.

20      And then he distinguishes what Gai does.  So first he says

21  the claims require that I ignore the designations of backup

22  versus active, and then he says, this is completely contrary to

23  Gai which explicitly designates one of them with an in use and

24  one of them as backup.

25      So our claim construction -- I'm going to go back to the

—40—

1    slide presentation.  Hopefully -- have we been on the file

2    history this whole time?  I hope so.

3        THE COURT:  Yes.

4        MR. ROSENTHAL:  Oh, good.  I'm glad.  Otherwise, I would

5    have been pointing to a bunch of stuff that nobody sees.

6        Let me just go back to the slide.  So if we go back to our

7    claim construction, the language of our claim construction

8    that's in quotes here on the left side of Slide 33 is verbatim.

9    We took it directly from that argument over Gai.  And what we

10    said is, it ignores the designation of a backbone VLAN trunk is

11    in use or standby.  So that's exactly what he said the method

12    of the present invention requires.

13        And we then say "as opposed to," and then we quote what he

14    distinguished during association of VLANs with trunks

15    explicitly designating one as in use and others as backup.

16        So what we're trying to do here is to give teeth to the

17    argument that they made, and it's not intuitive.  This is not a

18    situation like, you know, in some circumstance if I say, you

19    know, I've got a claim that says, I claim a red wagon, and

20    somebody, the examiner rejects my claim with an orange wagon

21    and I say, no, no.  That's not red.  Red is, you know, here on

22    the color spectrum and this is what red is, and that's not red.

23    I could see not construing the word "red" because red has a

24    plain and ordinary meaning.  This is not that situation.  Here

25    the distinction that the applicant made used a very convoluted,

1   maybe even incorrect but a very specific nonintuitive meaning

2   of this term in order to distinguish otherwise

3   undistinguishable art.  And in our view, it is indeed the

4   purpose of claim construction to give meaning to those types of

5   distinctions.  And so that's why we've asked for a

6   construction.

7        I think I do have another couple of things to say on this

8   point, but in view of your instruction earlier, maybe I'll

9   pause there.

10        THE COURT:  Okay.  That'd be great.  I'll hear from -- a

11   response from the plaintiff.

12        MR. HUANG:  Yes, Your Honor.  Jeffrey Huang for plaintiff.

13        First of all, I'd just like to point out, and if we --

14   staying on this slide is fine.  The actual confusing thing is

15   defendants' proposed construction.  I'm still not clear what

16   their proposed construction is trying to do, given it rewrites

17   the claim construction but totally admits entire concepts, such

18   as selection and association and stackable trunk ports.  That

19   appears nowhere in their proposed construction.  So I don't

20   even know how their proposed construction would work.

21        But, regardless -- and I'm not going to repeat everything

22   in the briefing as Mr. Rosenthal said.  All this is -- appears

23   in the briefs already, all these arguments.  But from what I'm

24   hearing -- and, again, there's no clear and unmistakable

25   disavowal.  Basically the applicant had a disagreement with the

1    examiner about what was actually disclosed in the prior art

2    reference Gai.

3        And unless Your Honor has anything specific for me, that's

4    all I have on this.  Thank you.

5        THE COURT:  Mr. Rosenthal?

6        MR. ROSENTHAL:  Your Honor, the only other thing that I

7    had to say is that the argument that Mr. Huang just made that

8    was in their briefs as well that this -- that we are somehow

9    eviscerating pieces of the claim language, that we are somehow

10   making up concepts, that we are rewriting the claim, this is --

11   certainly we have no intention of doing that.  And if we want

12   to tweak the language of our construction to make it wordier,

13   to keep some of the language that's already in the claim,

14   that's fine.  What's not fine, in our view, is to as a result

15   of that say, I am going to -- for WSOU to say, I am going to

16   ignore the fact that I use this very specialized nonintuitive

17   meaning of this term to distinguish the prior art.  I want to

18   ignore that because now I want to pursue an infringement theory

19   that's totally contrary to that.  We don't have any intention

20   of removing anything from the claims.  That's not our intention

21   at all.  Our intention is to take the words that the applicant

22   used to distinguish the art on this very claim term and have

23   the jury understand that they cannot go back on those words

24   with an instruction.

25       I believe that is all I wanted to say.

43

1      THE COURT:  Anything else from counsel for the plaintiff?

2      MR. HUANG:  No, Your Honor.  Thank you.

3      THE COURT:  I'll be back in a few seconds.

4      MR. HUANG:  Thank you, Your Honor.

5      (Pause in proceedings.)

6      THE COURT:  Thank you all for being patient.  Let's go

7  back on the record.

8      The Court is going to go with plain and ordinary meaning.

9      The next claim term up is "processing unit for setting the

10  Internal Port Path Cost" and goes on from there.  I'm happy to

11  hear your argument.

12      MR. ROSENTHAL:  Thank you, Your Honor.  This one -- now

13  I'm ready for this one.

14      I'm going to put on my slides again.  I don't know why I

15  took it down.  Hang on a second.

16      Okay.  You should see the claim language on the screen

17  now.  Is it coming through?

18      THE COURT:  Yes, sir.

19      MR. ROSENTHAL:  All right.  Thank you, Your Honor.

20      So, Your Honor, let me actually just scroll back to the

21  dispute.  So this is a Williamson issue.  We have a claim term

22  that is a processing unit for setting costs, and then it goes

23  on about what the costs are, but it is a processing unit that

24  sets costs.  And there is nothing about the language of that

25  claim limitation that provides any structure whatsoever.  It

1   might as well say a means for setting the internal path cost.

2       And one nice test I like to use or I like to think about

3   when I'm thinking about a Williamson type issue is, if I

4   replace the word with "means," would the structure be any

5   different?  Would the claim read any differently?  And the

6   answer in this case is absolutely not.  If I wrote down a means

7   for setting the Internal Port Path Cost to one of the ports to

8   one of the bridges too high, that has the very same scope as

9   saying the processing unit for doing it.  And that's a very

10  good litmus test for whether the words that are used are just a

11  substitute for the word "means," and that really is how the

12  Williamson court articulated the test is if you're just using

13  words that are substitutes for the word "means," that doesn't

14  get you out of means-plus-function claim.

15      So not only does it not pass that litmus test, but the

16  term "processing unit" itself has been repeatedly found by

17  courts to be a nonce word.  In fact, we cite the Optis Wireless

18  Tech which is an Eastern District of Texas case found that the

19  term processing unit invokes 112(6).  I don't think that Your

20  Honor has had occasion to find that.  We haven't found it in

21  your cases.  But the MPEP, as we talked about in our briefs,

22  talks about the term "unit" itself being a nonce word.  Adding

23  "processing" to it doesn't add anything.  That just says it is

24  a unit that processes.

25      So we're left with when you look at the claim language the

1   essence of functional claiming.  A device configured to do X.

2   And the Federal Circuit and the Supreme Court have consistently

3   held over the decades that that is not an appropriate way to

4   claim an apparatus claim, and that when you have a word that is

5   completely devoid of any structure in and of itself and it is

6   defined solely by its function, that's when you've invoked

7   112(6), and then you have to go to the specification.

8       Now, in WSOU's brief when they address this term, and they

9   address it in their opening brief and they addressed it in

10  their reply brief, they never point to anything in the claim

11  itself that they say provides structure.  There's no case that

12  is on point.  They've cited some cases that are easily

13  distinguishable because in those cases there was other claim

14  language that clearly imposed structural limitations.  So what

15  they do instead is they look at the specification and they say,

16  well, if you look at the specification, you'll see that there

17  are indeed processing units recited in the specification.

18      So they point to -- if we look at my Slide 48, which

19  there's a reproduction of Figure 1, Figure 1 bridges, and

20  inside the bridges there's a box.  And that box is 108.  That's

21  called a processing unit.  They say, well, look.  There's a box

22  in the specification that's called a processing unit.

23  Therefore, the word "processing unit" has meaning, and,

24  therefore, when it's written in the claims, a person skilled in

25  the art would know what metes and bounds are around that claim.

46

1   That's just not how the law works.  The law requires that the

2   claim provide sufficient structure in the language of the claim

3   as read by a skilled artisan to avoid 112(6).  Once you get to

4   112(6), you then look to the specification to determine whether

5   there's any sufficient structure.

6        So not only is this irrelevant to the question of whether

7   112(6) applies, but once you get to the conclusion that 112(6)

8   applies, then the question is, what is it that's disclosed in

9   the specification that corresponds?  And the only thing that's

10  in the specification, literally the only thing is there's a box

11  called 108, and the Box 108 is described as being a processing

12  unit.

13       Later in the '435 patent the patent describes that there

14  is a method for fully or semiautomatically configuring the

15  IPPCs.  And that is literally the only disclosure.  It's the

16  only one that WSOU cites in their brief as well.  And we've

17  scoured it.  There's nothing else.  The only disclosure of this

18  function of setting core costs is in this one sentence that

19  says it can be done fully or semiautomatically.  There's no

20  disclosure of an algorithm.  How does it determine which core

21  costs to set, when to set it, on what inputs, what steps does

22  it take, and there's no even connection of that to any of the

23  black boxes.  But even if there were, they are just black

24  boxes.

25       So this is a situation where they used a nonce word to do

1    structural claiming in the claims, and when you go to see

2    what's described in the specification, all it does is it says

3    this vague, you perform the function automatically or

4    semiautomatically, but there is no algorithm for how to perform

5    that type of function.

6        So for that reason, not only should the claim be read

7    according to means-plus function, according to 112(6), but it

8    should be found indefinite.

9        And that's all we have on this one, Your Honor.

10       THE COURT:  Thank you, sir.

11       A response?

12       MR. HUANG:  Yes, Your Honor.  Jeffrey Huang again for

13   plaintiff.

14       Let's see where to start with this.  I'll start where Mr.

15   Rosenthal left off.  Regarding the fully or semiautomatic

16   configuring of the IPPCs of the ports.  What Mr. Rosenthal left

17   off is -- and this is at Column 8 starting at Line 4 through

18   about Line 9, but in the beginning what Mr. Rosenthal failed to

19   mention is it says, from the foregoing, it can be readily

20   appreciated by those skilled in the art, and then it goes on.

21   And there's nothing in the record that contradicts that and

22   certainly nothing by clear and convincing evidence where the

23   patentee specifically announces that this is known in the art.

24       And, number two, going forward, as to Mr. Rosenthal's

25   characterization of the case law, that's simply not correct.

1   For example, in Samsung v. Prisua -- and this is 948 F.3d 1342

2   at 1355, a 2020 Federal Circuit case.  There the Federal

3   Circuit held that digital processing unit is not subject to

4   112(6) because the term clearly serves as a standard for a

5   general purpose computer or a central processing unit, each of

6   which would be understood as a reference to structure.

7        And there's also a case in the Eastern District of Texas

8   that's PanOptis v. Blackberry, and that's -- the cite there is

9   2017 Westlaw 497571, and that's at star 18 to 19 where that

10  court in the Eastern District of Texas found that the term

11  "process server" refers to a recognized class of structures,

12  and that's important because the Federal Circuit case law

13  generally for this area is to determine whether a claim recites

14  sufficient structure.  It is sufficient if the claim is used in

15  common parlance by persons of skill in the art pertinent to

16  designate structure even if the term covers a broad class of

17  structures and even if the term identifies the structures by

18  their function.

19       So that's all I have.  Everything else we stand on our

20  briefs unless you have questions for me, Your Honor.

21       THE COURT:  Mr. Rosenthal?

22       MR. ROSENTHAL:  Yes, Your Honor.  I'd like to address

23  those two cases.

24       The Samsung case is completely inapposite because there

25  the parties agreed that there was corresponding structure in

1    the claim.  They agreed that the claimed "digital processing

2    unit" in the context of that claim language had structure.  So

3    this totally -- there was no ruling on the point.  It was

4    agreed.

5        And in the PanOptis case the claim language similarly had

6    additional limitations in it that presented nonfunction

7    limitations to the term.

8        The term here "processing unit" to -- that is configured

9    to perform these functions or setting the IPPC, literally any

10   device that sets core costs, that sets the IPPC costs, would be

11   within the potential ambit of this claim because there is no

12   structural limitation to it.  And in the context of computer --

13   general purpose computers like a processor or a processing

14   unit, the way that those terms, according to the Federal

15   Circuit, get structure is through the algorithm that is

16   programmed onto the processing unit.

17       And there is no case that they -- that WSOU has cited that

18   says that you can simply say that because there is a processing

19   unit that has a black box, that that is sufficient structure.

20   At least no case since WS Gaming that says that.

21       So in this case -- and I didn't hear anything in the

22   arguments and there is nothing in the briefs.  There is nothing

23   in the briefs and nothing in the argument today that the term

24   "processing unit" itself connotes specific enough structure to

25   get over this hurdle, and the only thing in the specification

1    is a black box.

2        And that's all I have, Your Honor.

3        THE COURT:  Is there a response to what Mr. Rosenthal just

4    said that there's -- no argument has been made that there's any

5    intimation of structure?  If you all would like to respond

6    that, I'd be happy to hear it.

7        MR. HUANG:  Yeah.  And this is in our briefs, Your Honor.

8    We disagree with that.  The -- as it's shown in part in Mr.

9    Rosenthal's slide, the specification specifically points to the

10   processing unit 108 and the bridges A, B, C and D are used to

11   set the IPPC of any port P1, P2 and P3 of any bridge A, B, C

12   and D to either high or low.  And, again, that's at Column 7,

13   Lines 57 through 67.

14       And, you know, I'm not going to repeat the discussion

15   about the case law.  That's also in our briefs.  So unless Your

16   Honor has more questions for me, that's all I have.

17       MR. ROSENTHAL:  Your Honor, may I briefly --

18       THE COURT:  Yes.  Of course.

19       MR. ROSENTHAL:  Thank you so much.

20       That is indeed in the plaintiff's brief.  It's on their

21   reply brief at 14 and 15 where they highlight that very passage

22   that I've got on my slide, Column 7, Line 56 to 62.  And the

23   point is, that's not in the claims, first of all.

24       Second, it's a black box.  Even if the claim said a

25   processing unit wherein the processing unit is processing unit

1    108, this box, that doesn't -- that still doesn't provide

2    sufficient structure under the case law.  But the claim doesn't

3    even say that.  The claim simply says a processing unit, and

4    the entirety of the plaintiff's briefing on this point in both

5    of their briefs, the entirety of it is to look to the spec

6    which is backward.  In order to first decide whether or not

7    112(6) is invoked, we first start with the claim.  Does the

8    claim have enough structure?  Only if the claim doesn't have

9    enough structure do we then say, well, what's disclosed in the

10   spec?  And what the plaintiff does, because it knows it can't

11   look at the claim language, is it just goes right to the spec

12   and says, hey, I've got processing units 108.  So, therefore,

13   there's enough structure.  But the problems with that are, A,

14   it's not in the claim, and, B, even if it were in the claim,

15   it's nothing but a black box.

16        MR. HUANG:  If I may add one quick thing, Your Honor?

17        THE COURT:  You can say whatever you'd like.

18        MR. HUANG:  Thank you.

19        Mr. Rosenthal I believe is just wrong on the law in both

20   points.  There's no authority for this position that the

21   structure has to be in the claims, and there's no authority for

22   his proposition that if the structure is what he determines to

23   be a black box, that's not sufficient.  First, again, this is

24   Skyy v. Mindgeek, a Federal Circuit 859 F.3d 1014.  It says to

25   determine whether a claim recites sufficient structure, it is

52

1    sufficient that the claim term is used in common parlance or by

2    persons of skill in the pertinent art to designate structure.

3        And here processing unit is used by persons of skill in

4    the art to designate structure as -- and that's why we go to

5    the specification to show that the specification recites

6    structure as would be understood by one skilled in the art,

7    which, again, the specification does expressly set out as --

8    that it is understood as one skilled in the art.

9        And, again, we have case law again in the briefs that show

10   that a processor itself is a recognized class of structures.

11   And that's all I have, Your Honor.  Thank you.

12       MR. ROSENTHAL:  I hate to have a ping pong ball, Your

13   Honor, but I do want to respond, if I may, just to one point.

14       THE COURT:  Of course.

15       MR. ROSENTHAL:  Counsel just said that we have no

16   authority for the notion that you have to look to the claim and

17   not the specification to determine whether or not 112(6) is

18   invoked.  And it's interesting that counsel says that because

19   we cited that authority in our responsive brief.  The authority

20   is MTD Products versus Iancu.  We cited it twice in our opening

21   brief.  We cited it specifically with respect to this term.

22   They did not respond to it.

23       And so then in our surreply brief we cited it again, and

24   we said they keep doing the wrong thing.  They're going to the

25   specification instead of looking at the claims.

1           And then we say in our surreply brief, we say, the Federal

2   Circuit has squarely rejected this approach, and then we cite

3   MTD Products.  Then we say WSOU has no response to MTD failing

4   to address it in its briefing, and that is true.  And they

5   didn't address it today.  The only argument that they made

6   today is, we don't have any authority.  This authority is so

7   black letter that you have to in determining whether something

8   is subject to 112(6).  It is uncontrovertible that that's where

9   you start is what is in the claims.  And rather than addressing

10  that authority, the plaintiff simply says, we don't have any

11  authority, and they don't address it.  We have addressed every

12  single one of the cases that they cited, PanOptis, Samsung.

13  All of those cases we address in Footnote 12 of our surreply

14  brief.  There's a fundamental problem with the way that they're

15  approaching 112(6) which is going to the spec and trying to

16  bootstrap in.  And they are not addressing the case law that

17  says that that is inappropriate to do.

18          Thank you, Your Honor.

19          THE COURT:  Anything else, Mr. Koide?

20          MR. HUANG:  Mr. Huang, Your Honor.

21          THE COURT:  I'm sorry.  I apologize, Mr. Huang.

22          MR. HUANG:  No problem.  Sure.

23          All I'll say is that Mr. Rosenthal's wrong.  We do go --

24  we start with the claims.  Processing unit is in the claims.

25  We're just pointing out that the specification supports that

1   one skilled in the art would understand processing unit

2   structure.

3        Thank you, Your Honor.

4        MR. ROSENTHAL:  Thank you, Your Honor.

5        THE COURT:  I'll be back in a few seconds.

6        (Pause in proceedings.)

7        THE COURT:  The Court is going to maintain its

8   construction of plain and ordinary meaning.

9        The final claim term is "rate of change."  And as usual,

10  Mr. Rosenthal, you're welcome to argue whatever it was you're

11  planning to, but one thing I would encourage you to argue or

12  address is the problem we have occasionally is when someone

13  proposes a claim construction, we worry that it might inject

14  the need for another claim construction or -- and so here it

15  wasn't -- I worry that there might be a fight in part over what

16  is instantaneous.  And so you might have -- your expert might

17  have one opinion.  Someone else might have another opinion and

18  we -- instead of -- and so the fight over whether or not

19  there's infringement with respect to rate of change might

20  evolve into a fight over what instantaneous means.  So that's

21  my -- you're welcome to say anything you care to about why I

22  should give the construction for plain and ordinary meaning

23  you've advocated, but I'll tell you that my reluctance to give

24  the construction was in part the concern over injecting another

25  word that might have to be construed.

1      MR. ROSENTHAL:  Well, that question is too hard for me.

2  So I'm going to pass this whole term over to Ben Kershkowitz

3  who's going to address this term.

4      MR. HERSHKOWITZ:  Good afternoon, Your Honor.  Can you

5  hear me just fine?

6      THE COURT:  You actually appear to be someone I might

7  actually say they must really hate you that they gave you this

8  claim term, and you wouldn't be hurt by that, but...

9      MR. HERSHKOWITZ:  Not in the least.  Not in the least.

10      THE COURT:  So I'm happy for -- Mr. Hershkowitz, for you

11  to argue whatever -- are you in the New York office also?

12      MR. HERSHKOWITZ:  I am in the New York office, although I

13  am right now in what is affectionately called my office/gym/

14  bedroom.

15      THE COURT:  I understand.  When are you all going back to

16  work?  Well, not -- that's --

17      (Laughter.)

18      THE COURT:  When are you all going to start going back to

19  the office in your city?

20      MR. HERSHKOWITZ:  You know, it has not been set in stone.

21  The city's supposed to open up a little bit more after the July

22  4th weekend, but my best guess would be that sort of after the

23  summer hopefully the city will be, you know, more robustly,

24  fully open, but it has been a real challenge here over the

25  past, you know, year and change.  And I live in the city, and

1    as I tell everybody, while it's -- I have a lovely gilded cage,

2    it's still a gilded cage at the end of the day without the

3    backyard and everything else.  So I'm very envious of anybody

4    that has their little patch of land behind their home.

5            THE COURT:  I fully understand.  Sam Sparks who was a

6    judge from 1991 until now when he's pretty much fully senior

7    status, he and his wife have moved into a wonderful place that

8    older folks live in, and she refers -- whenever she deals with

9    people, she refers to her and her husband as inmates, which I'm

10   sure the manager of the facility loves hearing her describe

11   themselves as.

12           So, well, I hope for your sake and the folks up north, I

13   hope you guys get opened up.

14           MR. HERSHKOWITZ:  Much appreciated.  Your sentiments are

15   shared by everybody up here.

16           THE COURT:  Including my brother and sister-in-law who

17   live in New York City.

18           You heard me say that part of my concern was over

19   injecting the word "instantaneous," but as I also said, you're

20   free to -- you're free to argue whatever it is you care to, but

21   that's something I would hope that you would address.

22           MR. HERSHKOWITZ:  And of course I will, Your Honor.  Let's

23   just take a step back, you know, for a moment and understand

24   that I think there's universal agreement that there is a plain

25   and ordinary meaning of rate of change.  And I also believe

1   that reasonable minds probably should not or could not differ

2   on what that plain and ordinary meaning is.

3        And being the last person that is speaking today on the

4   last term, I will try to give back as much time as possible.

5        (Laughter.)

6        THE COURT:  You'd be surprised, Mr. Hershkowitz.  A lot of

7   claim terms that one might think there could not be a

8   reasonable dispute over what the plain and ordinary meaning is,

9   a lot of people are making a lot of money arguing to me that

10  that's not true.  So...

11       MR. HERSHKOWITZ:  Fair enough.

12       THE COURT:  So when -- you know, you can have fights over

13  words like -- what was the -- Josh, what was the one --

14       (Off-the-record discussion.)

15       THE COURT:  Social media.  That was one I was asked to --

16  and so people will argue over a lot, so...

17       But I'm welcome to hear this.

18       MR. HERSHKOWITZ:  Fair enough.  And I won't say I'll be

19  brief because I've seen in your transcripts any time anybody

20  says that, you have indicated that that normally means you're

21  in for a long session.  So I will skip that part of it.

22       So what we have here, Your Honor, is that the term "rate

23  of change" is used in the claim.  And I understand your concern

24  is with the concept of the instantaneous value.  Why don't we

25  start with the claims so we see how this is done?

58

1          What we have here, which is the asserted claim, is a

2    method for monitoring usage of a resource in nodes of a

3    network.  And an example that's given in the file history of

4    that usage is how much bandwidth is being allocated, for

5    example, to a particular type of traffic.  And they say we want

6    to keep that amount of traffic, that volume of traffic below

7    30 percent.  And so what it is is it's monitoring the usage of

8    that 30 percent, and it says, if it goes over 30 percent, you

9    set off the alarm and you kick something back to the management

10   station.  And the management station can then take a reaction.

11         But that is not rate of change.  And they explain that in

12   the file history quite clearly that that is not a rate of

13   change.  And what we have here is if we look at Limitation A,

14   the highlighted limitation, it says "monitoring usage of the

15   resource in a node to determine when a rate of change of the

16   usage exceeds a predetermined threshold."  What it doesn't say

17   is monitoring the usage of a resource in a node to determine

18   when the usage exceeds a first predetermined threshold.

19         And so when we were talking about instantaneous value,

20   what we were saying is it can't just be the usage that exceeds

21   a threshold going over that 30 percent.  But it has to be a

22   rate of change.  And we understand this, Your Honor, because

23   when we take a look -- and I'm going to skip most of this just

24   to be brief -- is there's a comparison in the specification, a

25   discussion of Figure 2 and a discussion of Figure 4.

1    In Figure 2 you have what I just discussed as exceeding

2    that 30 percent threshold.  And we see it here.  You monitor in

3    that rectangular or -- not quite -- a hexagonal -- excuse me --

4    box, and it says, track that usage of the resource which is $X_1$,

5    and when that usage exceeds, or equal to or exceeds is how it's

6    written there -- equal to or exceeds some predetermined

7    threshold, it triggers an alarm.

8    It then says, now let's look at rate which is what's shown

9    in Figure 4.  And for rate it says, look.  You can't just

10   measure it at exceeding 30 percent.  The example in the file

11   history was whether or not the rate changes at more than three

12   percent in some period of time.  And so this is saying, hey,

13   look.  If I'm at -- I'm going to make it up -- 29 percent and I

14   go to 31 percent, well, I haven't exceeded that three percent

15   rate because the difference between 30 and -- 31 and 29 is two.

16   And so this is effectively saying, Your Honor, that's what we

17   mean by rate of change.  We don't mean Figure 2.  We mean

18   Figure 4.

19   And so what ended up happening, Your Honor, is that this

20   then came up and was the center of a number of the arguments in

21   the file history.  And one of those arguments was looking at a

22   reference called Mandal.  And this is what the applicant

23   stated.  They said, as taught in Mandal, the value is an

24   instantaneous value.  This is where we got instantaneous from,

25   Your Honor -- measured at a fixed period of time what point in

1    time that is compared against the threshold value.  In other

2    words, let's compare what the percentage of traffic is and

3    compare it against that 30 percent threshold, right?

4        And instantaneous value measured at a fixed point in time

5    as taught in Mandal is simply not a rate of change as claimed

6    by applicants in Claim 1.

7        A rate is clearly measured using a time interval or some

8    other interval.  In other words, you've got to take those two

9    measurements, and there is no time interval in Mandal.  Mandal

10   is devoid of any teaching or suggestion of monitoring any rate.

11       If we go to the very next slide, this is the paragraph

12   immediately preceding that paragraph.  And they say,

13   "Applicants respectfully maintain that Mandal does not teach a

14   rate of change.  Rather, Mandal teaches a policy in which a

15   value of a percentage of bandwidth used for video measured at a

16   specific point in time is compared against the 30 percent

17   threshold."  In other words, this is exactly what is set forth

18   in Figure 2.  An example of it.  Which again is not a rate of

19   change.  For example, at time $t_1$, the percentage of bandwidth

20   which is used for video is 28 percent which is less than the

21   threshold of 30 percent.  This simply does not teach or suggest

22   a rate at which the percentage of bandwidth used for video

23   changes.  For example, a value of 28 percent at a specific

24   point in time does not teach or suggest that a percentage of

25   bandwidth used for video has changed at a rate of, for example,

1   three percent per hour.

2       So if we go back for a moment, Your Honor, to Slide 58, as

3   you could say, they're making the exact comparison in the file

4   history, the exact disclaimer that is comparing Figure 2, which

5   they're saying is what Mandal does, versus Figure 4 is what

6   they are saying a rate of change is.  This is what they said.

7   They didn't just do it once with Mandal.  It appears other

8   times.  They also did it with another reference which I will

9   absolutely destroy the name of called Boukobza.  And, again, it

10  says, "We do not find that Boukobza," which was again looking

11  at, they described it more generally, "a variable that is going

12  to change is in any way a rate."  It is simply measuring that

13  change, that dynamic variable, in other words, what percentage

14  of bandwidth you're using against a predetermined -- the

15  language of the claim, a predetermined threshold.

16      And so what we're trying to get across, Your Honor, is

17  that distinction.  And the reason of that is because when we

18  received their preliminary contentions, they are looking at

19  what is exactly Figure 2, what is exactly distinguished upon in

20  the file history.

21      More specifically, what they're accusing is the -- the

22  name is slipping my mind, but the current that is flowing

23  through the device and whether that current is exceeding a

24  value.  They're not looking at the change in current.  Is it

25  changing faster or slower?  They're just looking at that change

1    in current, that dynamic variable and whether or not it exceeds

2    that threshold.

3         So you may recall from our tutorial we gave the example

4    of, you know, a car driving down the road and then exceeding

5    55 miles per hour, right?  In other words, if the speed limit

6    says 55 and you go over it, you've exceeded that predetermined

7    threshold and the cops are going to pull you over.

8         On the other hand, if you accelerate just from 20 to 50

9    really quick, that might be another reason why they pull you

10   over because your rate of change between .1 and .2 between the

11   start of the interval and the end of the interval has exceeded

12   something else.  It doesn't matter whether you've gone over 55

13   or not.  It's looking at that rate of change.  So, in other

14   words, it's the comparison between Figure 2 and Figure 4.

15        How that gets described?  We understand the challenge.  We

16   took instantaneous because it was as shown in the -- woops.

17   Went too far -- as shown on Slide 59.  It was the words that

18   the applicant put on this at the time they were trying to get

19   these claims allowed and distinguished over the prior art.

20   Some other terminology absolutely could be used.  We understand

21   Your Honor, for example, in the Bell Semiconductor case was

22   concerned about perhaps giving an instruction to the jury but

23   sort of gave the parties guidance.  What we are trying to do is

24   have that guidance, because while we understand and appreciate,

25   as you said at the very beginning of this call, that, you know,

1  where the issue is going to be joined is in the expert report

2  if they put something in there that we believe is not the

3  ordinary meaning, their expert is providing his or her own

4  meaning, that's no ordinary meaning, we can move to strike

5  that.  We could bring this on summary judgment, but there's a

6  lot of runway between now and then in which the parties are

7  going to spend a tremendous amount of time, money, energy and

8  effort and perhaps take up this Court's time when clarity now

9  we believe should end this patent being asserted against Dell.

10     And so that's where this issue is largely joined and where

11  we were hoping to get guidance using the very words, the very

12  statements that they made, and those statements in the file

13  history are completely consistent with the ordinary meaning

14  which they set forth in the specification.

15     So let me pause there, Your Honor.

16     THE COURT:  May I hear a response?

17     MR. KOIDE:  Yes, Your Honor.  This is Brian Koide.  Can

18  you hear me?

19     THE COURT:  I can.  Yes.

20     MR. KOIDE:  Okay.  Mr. Hershkowitz, can I get -- thank

21  you.

22     MR. HERSHKOWITZ:  Sorry about that, Brian.

23     MR. KOIDE:  That's okay.

24     Hang on just a second, Your Honor.  Well, I'm sorry.  I'm

25  having trouble getting -- let me try that one more time.  Oh,

1   there it is.

2        Okay.  Can you see my screen now?

3        THE COURT:  I can.

4        MR. KOIDE:  Okay.  Again, the arguments I heard Mr.

5   Hershkowitz make again are all cumulative of the arguments they

6   made in their briefs.  So -- and I appreciate Mr. Hershkowitz'

7   comment about -- I again also will not say I'll be brief, but

8   again I'm not going to try to repeat myself.

9        The genesis and the thing they try to grapple onto are the

10  statement in the prosecution history.  They point to two

11  statements in the prosecution history.  This is from our brief,

12  from our reply actually citing a little bit broader portion I

13  think that Mr. Hershkowitz had up on the screen.  But just to

14  explain this, Your Honor, the Mandal reference in the

15  prosecution history talked about values of bandwidth,

16  30 percent.  Okay?  And so what they were saying was is like,

17  you know, a near value of 30 percent is not a rate of change.

18  They talk about how one way to calculate the rate of change

19  would be, here.  You look at the amount and you then say it's

20  three percent per hour.  Something that was changing over a

21  period of time.  That doesn't -- if the Mandal had taught

22  something that was a rate of change itself, they wouldn't be

23  saying the same thing.  If it was teaching -- you know, Mandal

24  teaches three percent per hour, they wouldn't say you would

25  need to kind of calculate it because that's inherently a rate

1   of change.

2        Similarly, with Mr. Hershkowitz' example of velocity,

3   velocity is a rate of change, and when we -- both sides talk

4   about the car example.  That would be a rate of change.  A

5   POSITA -- and I would offer here, you know, probably even a --

6   you know, a middle school or high school student would

7   understand the concept of rate of change.  It's a basic

8   physical property.  It doesn't even change -- a POSITA of a

9   more advanced level wouldn't then say, okay.  Well, I'm going

10  to have this different level.  It's how a value changes over

11  time.  So that's the -- that's our main point.

12       Our first point in our briefing is that there's an

13  ordinary meaning for rate of change.  We don't really buy

14  into -- they seem to kind of put their construction in the

15  guise of plain and ordinary meaning, but that is not the plain

16  and ordinary meaning of rate of change.

17       And to address Your Honor's question about instantaneous,

18  a POSITA again or just the basic physics of rate of change,

19  there would be an instantaneous rate of change at that instant,

20  and there could be a continuous rate of change.  So it's

21  artificial to limit the phrase "rate of change" to

22  "instantaneous" at one point in time.  That is -- you know,

23  it's something that's just going to confuse a jury.  It's not

24  accurate for the plain and ordinary meaning.

25       The other portion of the prosecution history they talk

1   about is this -- again, I can't pronounce this either.  I don't

2   have any more special skills than Mr. Hershkowitz -- is this

3   Boukobza, which is -- for the court reporter, it's

4   B-o-u-k-o-b-z-a.

5       Okay.  And that one is even less helpful to them because

6   it's just talking about generic parameters.  So again there's

7   no teaching -- when they mean generic, they mean something

8   that's not a rate of change parameter to some type of

9   parameter.

10      Now, they -- Dell grapples onto the portion of the

11  specification where there are discrete units and they show how

12  rate of change is calculated kind of in a longhand way, you

13  know, using time difference just like you would calculate

14  velocity based on two distance points and then the time that

15  covers it.  But that doesn't mean that's the only way -- that

16  doesn't define rate of change.  There's only one way to

17  calculate it.  And that was explained in our brief.

18      So that -- kind of broad brush, those are our points.  We

19  don't think this is -- that they are -- their reading is

20  consistent with the plain and ordinary meaning.  There is no

21  disavowal.  We think they're misreading the prosecution

22  history, and the specification when it talks about rate of

23  change, it's only showing one way.  It's not limiting it to

24  that.  That's the only way you can calculate rate of change.

25      And in the car velocity example, we note there are -- you

1    know, of course you could calculate car velocity using that

2    distance.  You can calculate it using various instruments like

3    a Doppler radar or, you know, some GPS.  It's not always going

4    to be calculated necessarily using that kind of longhand

5    calculation.

6        So those are our arguments, Your Honor.  But we largely --

7    other than that, we'll stand on our brief.

8        THE COURT:  Response?

9        MR. HERSHKOWITZ:  Yes, Your Honor.  Just two brief

10   responses, even though I may not be as brief as you'd like.

11       Never is Figure 2 -- and I'll just put it back up again --

12   throughout the patent, throughout the file history anywhere is

13   Figure 2 ever called a rate of change.  It is only called a

14   value.  It's never called a rate of change.  What we are trying

15   to do and what they distinguished the prior art on is values

16   are not rates of change.  That's what they said.  They said it

17   effectively in the spec, never calling a value a rate of

18   change.  They drew a distinction between Figure 2, and we see

19   it here in Box 203 and Figure 4 and Box 403.  Again, we are

20   simply trying to get to the heart of the matter which is that

21   Figure 2 is not a rate of change.

22       Separately, they keep saying that there are these other

23   ways to measure.  Honestly, it's a tremendous amount of hand

24   waving that's being done, and we've addressed that in our

25   briefing.  So I won't take up the Court's time with that other

68

1    than to say it's really simple.  If you are measuring a dynamic

2    value, which is what Boukobza calls it, a dynamic value against

3    a threshold, so, in other words, the speed of the car against

4    the 55-mile an hour sign, whether you're measuring the amount

5    of capacity being taken up, which is going to vary, against

6    that 30 percent threshold, that is the simple value node

7    process shown in Figure 2.  And that is not a rate of change.

8         Second, although a less important point, is they never

9    really identify anything other than this formula for being able

10   to compute and understand a rate of change.  Maybe there is;

11   maybe there isn't.  We haven't heard them actually articulate

12   one, but what we do know is that whatever it is, it cannot be

13   Figure 2, and it cannot be what they confirmed the plain and

14   ordinary meaning was in the file history which was it cannot be

15   a dynamic value simply measured against a predetermined

16   threshold.

17        The claim, if we go back to it again, says the "rate of

18   change of the usage," not monitoring the usage in a node to

19   determine when the usage exceeds a first predetermined.  It's

20   when the rate of change exceeds.

21        And I'll stop there, Your Honor.

22        MR. ROSENTHAL:  Your Honor, I'm sorry to jump in.

23   Normally I would pass Mr. Hershkowitz a note at the podium, but

24   I can't do that.

25        The only thing I wanted to add, if you don't mind, is just

1    if you -- if the Court is hung up on the word "instantaneous,"

2    which comes from the file history, we are fine.

3         Paul -- Ben, your screen is up on the screen.

4         MR. HERSHKOWITZ:  Apologies.

5         MR. ROSENTHAL:  Your Honor, we would be fine just removing

6    the word "instantaneous" and saying "not a value measured at a

7    fixed point in time."  We're not reading anything into that

8    wording "instantaneous."  That just comes from the file

9    history, but to the extent that's a concern, that's not an

10   important part of the construction at all.  I just wanted to

11   add that point.  That would have fit nicely on a Post-It.

12        THE COURT:  Anything else from anyone?

13        MR. KOIDE:  If I could just briefly respond.  I shouldn't

14   say briefly.

15        (Laughter.)

16        THE COURT:  Sure.

17        MR. KOIDE:  But I'll respond.  Again, their emphasis on

18   Figure 2, Figure 2 is showing a non rate of change parameter.

19   If it was showing a rate of change parameter, then they

20   wouldn't have -- you wouldn't have to go through that

21   calculation.  Just like in Mandal where it's showing

22   30 percent, 30 percent doesn't show you the rate of change, and

23   Mandal also talks about there's no -- I mean, that portion of

24   the prosecution history talks about there's no interval.

25        So when you have these points, if you just have a point

1    that's not inherently rate of change, you need to get something

2    to calculate it kind of in the longhand way.  But that does not

3    carve out from the plain meaning which Dell presumes to take of

4    plain meaning of rate of change means something that's, you

5    know, at a certain point in time or instantaneous.  That is not

6    going to solve the problem, Your Honor.  The problem is that

7    rate of change has a plain and ordinary meaning, and their

8    point about how there's only one rate of change showed, there

9    is case law, including in Phillips itself, saying even if there

10   was only one preferred embodiment, that's not a reason to

11   invoke the cardinal sin of limiting to that one particular

12   embodiment, and a POSITA would understand there are other ways

13   to calculate or measure rate of change.  So that's why it's not

14   spelled out expressly.  And even if it was just limited to that

15   one embodiment, we shouldn't be limited to that way of

16   calculating rate of change.  That's essentially what they're

17   doing.  They're trying to limit it to the one way of

18   calculating rate of change that's shown in one example of the

19   preferred embodiment.

20        THE COURT:  If you all will give me just one a second,

21   I'll be right back.

22        MR. HERSHKOWITZ:  Thank you, Your Honor.

23        (Pause in proceedings.)

24        THE COURT:  If we can go back on the record.

25        I didn't mean to cut -- if you all had more to argue, I

1   just had something I needed ask before I heard it.  So if

2   anyone else wanted to say anything, I'm happy to hear it.

3        MR. HERSHKOWITZ:  Your Honor, the only point I was going

4   to make is I believe we appear to be in violent agreement based

5   on what Mr. Koide said that Figure 2 cannot be rate of change.

6   And so whether we have that provided, you know, as part of a

7   construction, as Mr. Rosenthal had suggested just removing

8   "instantaneous" and saying "not a value measured at a fixed

9   point in time," we'd be fine with that.

10       Alternatively, if it was as you had done in the Bell

11  Semiconductor case and provided guidance to the parties and the

12  experts that it can't be that, again, I think that would go a

13  long way towards helping the parties in resolving this case in

14  this patent.

15       Thank you.

16       THE COURT:  Anything else from -- I think it was Mr. Koide

17  who was arguing?

18       MR. KOIDE:  Yes, Your Honor.

19       We did not say that Figure 2 was excluded.  Our point is

20  that the claims talk about rate of change.  Okay?  So it's rate

21  of change of the usage, right?  And so Figure 2 happens to

22  describe an instance where the rate of change is manually

23  calculated and we kind of compare, contrast that from Figure 2

24  and Figure 4.  It's not limited to that way.  We're entitled to

25  get rate of change of usage as the claim recites.

1      THE COURT:  Response, if any?

2      MR. HERSHKOWITZ:  The only response I'd say is that Figure

3  2, as I mentioned earlier, is never ever called the rate of

4  change.  It is the instantaneous value.  It is the exact thing

5  on which they distinguished the prior art saying that it in

6  fact is basically Figure 2 and an instantaneous value or a

7  value.  So I'd be curious as to the pivot in the position after

8  the prior statement, but we can rest here, Your Honor.

9      THE COURT:  Okay.

10      (Pause in proceedings.)

11      THE COURT:  Here's what I'm going to do on this one, but

12  I'm particularly concerned about this claim term to try and get

13  it right.  I have had one trial where it wound up being a fight

14  at the trial over what the plain and ordinary meaning was in a

15  manner that I think was more law than fact, and so it was an

16  issue.  I am going to stick with plain and ordinary meaning at

17  this point, but I am persuaded by young Mr. Hershkowitz who

18  this may have been -- I know this may have been -- they must

19  not have really hated you -- actually they must not have hated

20  you.  They must have really thought a lot of you to give you

21  this claim term.

22      And so this one I think actually should stay on our radar.

23  I'll put that on the record.  I'm -- I think Mr. Koide did a

24  very good argument when he says that they should -- the

25  patentee should get the full scope of the claim, but I can

1    certainly see that there could be a problem here that is a

2    construction issue more than a factual -- that you may all

3    agree on fact -- on how it operates as a factual matter but

4    need my guidance on whether or not that meets the plain and

5    ordinary meaning of this claim term.  So after the final

6    infringement contentions are provided or after the expert

7    reports are given, the Court would certainly be happy to do a

8    second Markman on this in the context -- in a real-world

9    context to see if we think what is being argued is something

10   that meets the plain and ordinary meaning of this claim term.

11        So I think Justice Breyer in a Supreme Court argument once

12   said, the problem I have is that I listen to one side and I

13   think you're right, and I listen to the other side and I think

14   you're right, which makes these things really hard.

15        I completely understand why Dell is concerned about this.

16   I think you've made a good point.  I don't know that just

17   removing -- I chatted with Josh.  I don't know that just

18   removing "instantaneous" helps -- in an odd way helps you all

19   because that to me moves it closer to what is just saying plain

20   and ordinary meaning, which may not be the right thing to do

21   here.

22        So I invite you guys -- that's terrible to say.  I invite

23   counsel to come back down the road and address this once

24   everyone has a better idea of how they are going to be arguing

25   the actual Dell products infringe.

1          So let's shift -- I think that was all the claim terms.

2     Let's shift to an important issue to me which is the -- we

3     currently have a trial set on May 12th.  There are 12 patents.

4     I'm not going to try a 12-patent case.  I have -- you know, I'm

5     sure there are better judges than me who could pull that off.

6     I'm not going to do that.  What I would like to do here, I

7     am -- my attitude, generally speaking, is that four or five

8     patents is really the most one should try in a case.  I get it.

9     If two of the patents are very related, that's -- you know,

10    that's -- but, by and large, four or five independent patents

11    is really tasking a jury with as much as I think they can do in

12    fairness.  So what I would like you all to do initially and --

13    but here's -- there's going to be a catch, which is let's say

14    we divide it up five, five and two just for -- hypothetically.

15    You're going to prepare the case as though all 12 are going on

16    the first date, if that's clear.  And so despite the fact that

17    four of the patents may not be set until August of next year,

18    for example, the time won't stretch out to August of next year

19    to get the case ready.  All 12 patents will be prepared for as

20    if they were going to trial on May 12th, but my guess is no

21    more than five at the most will be going to trial.  Probably --

22    maybe if there are going to be three trials, the smart thing to

23    do would be to have four in each trial even though one or two

24    patents may fall out.  We'll see.

25         I would ask you all to give it the first try to figure out

1   what the best way is to divide up the patents, and you should

2   probably assume the second trial would be sometime

3   approximately three months after the first trial.  In my Intel

4   cases I set them two months apart, and, frankly, I think that's

5   a little too close for you guys.  It's great for me.  It's --

6   you know, I love these cases.  I love these trials, but I think

7   having done that now, I think with y'all's schedules, as busy

8   as you all are, as successful as you all are, I think demanding

9   that much of y'all's time back to back two months behind.  So

10  probably we'll be looking at May trial, three months another

11  trial, three months another trial, all of which -- in other

12  words, I'll try and get this done by the end of 2022.

13         And so -- but you all put your heads together.  If you can

14  come up with a group of four patents and then four patents and

15  then four patents, I'm absolutely fine with however you all do

16  it if you come to an agreement on it.  I'll try them.  If you

17  decide five, three and two -- I don't care how you all do it.

18  Whatever makes you all happy to have three trials, whatever you

19  all decide is the best for you and your clients if there are

20  three trials in the order you try to patents in the grouping it

21  of the patents, good on you.  If you can't come up with an

22  agreement, then submit your competing proposals to me and,

23  probably not unlike what I do with my two teenage sons, I'll

24  arbitrarily decide what to do and neither of you will be happy.

25  If you can't, and I understand sometimes why you can't, send it

1    to me and we'll just -- we'll self select and we'll put

2    together a package of three trials.

3         Having said all that, I'll start with Mr. Siegmund.

4         Is there anything you need to take up for the plaintiff?

5         MR. SIEGMUND:  No, sir, Your Honor.  I think that's it.  I

6    think you covered everything.

7         THE COURT:  Mr. Shelton?

8         MR. SHELTON:  I'm not aware of anything else, Your Honor.

9    Thank you so much.

10        MR. ROSENTHAL:  Your Honor, I'm sorry.

11        THE COURT:  Yes, sir.

12        MR. ROSENTHAL:  I do have something --

13        THE COURT:  Sure.

14        MR. ROSENTHAL:  -- real quick.

15        It's a matter of housekeeping of the -- actually two

16   matters of housekeeping.

17        First, do you have -- and I'm not obviously putting any

18   pressure or imposition on this, but do you know when you plan

19   to have the remaining Markman hearing on the rest of the two

20   groups?

21        THE COURT:  Tomorrow.

22        MR. ROSENTHAL:  Tomorrow?

23        (Laughter.)

24        THE COURT:  I don't.

25        MR. ROSENTHAL:  I'm good with that.  I'm fine with that.

1         THE COURT:  We will -- why don't we give me -- let me go

2    off the record for just one second.  I'll be right back.

3         (Pause in proceedings.)

4         THE COURT:  Very good question, Mr. Rosenthal.  We're

5    checking.  I'm in trial next week through Thursday or shorter

6    depending on how much I -- how long I think I can stand having

7    a trial.  But no.  I'm kidding.  But I'll be in trial through

8    Thursday.  If a week from Friday is available, we'll do it a

9    week from Friday.  If not, then we'll plan --

10        (Off-the-record discussion.)

11        THE COURT:  Yeah.  Let me go -- I'll be right back.  Let

12   me do a better job of trying to get you all an exact date,

13   because I don't want --

14        MR. SHELTON:  Your Honor, this is Barry Shelton.  I just

15   want to remind you that you have a pretrial conference for the

16   Freshub versus Amazon that's been tentatively set for 9:00 a.m.

17   on the 21st but not yet on your calendar.

18        THE COURT:  And when is the 21st?

19        MR. SHELTON:  That's a week from Friday.

20        THE COURT:  Okay.  Well...

21        (Off-the-record discussion.)

22        THE COURT:  We're checking on Friday afternoon.

23        Mr. Shelton, you said y'all's pretrial's is in the

24   morning?

25        MR. SHELTON:  Yes, Your Honor.  It's been tentatively set

1    by Jun for 9:00 a.m. on the 21st, but it doesn't show up on the

2    Court's calendar yet.

3        THE COURT:  Okay.  You know, Jun's a new American.  I

4    swore him in last week.

5        MR. SHELTON:  Oh, wow.  That's amazing.

6        THE COURT:  First person I've gotten to swear in as an

7    American.

8        (Brief off-the-record discussion.)

9        MR. SIEGMUND:  Your Honor.

10       THE COURT:  Yes, sir.

11       MR. SIEGMUND:  Not to further complicate things, but you

12   also have another Markman with us against --

13       (Off-the-record discussion.)

14       THE COURT:  That one's going to move, Mr. Siegmund.

15       MR. SIEGMUND:  Okay.

16       (Laughter.)

17       (Off-the-record discussion.)

18       THE COURT:  So here's what we're going to do.

19       Mr. Shelton, you're having -- you have inside information.

20   We are going to do your pretrial conference and we're going to

21   do the Markman both on that Friday, but don't hold us right now

22   to when they will be on Friday.  We'll jigger that here on our

23   end to get everything scheduled, but both will -- we'll let you

24   know early -- we'll let you know this week.

25       MR. SHELTON:  Thank you, Your Honor.

1        THE COURT:  It will be next Friday -- the Markman next

2    Friday.  I'm just not sure exactly when.

3        MR. SHELTON:  Very good.  Thank you.

4        MR. ROSENTHAL:  That's very helpful, Your Honor.

5        And then my only other housekeeping point is we had -- you

6    may recall we had some motions to dismiss that we filed in this

7    case and we had an argument on them in this case.  Decisions

8    were not rendered.  These were just before Christmas of last

9    year.  Obviously there's been some water under the bridge.

10   We've had some arguments over claim construction.  Some of the

11   arguments from the plaintiff were, hey, we should wait until

12   after claim construction before you rule on those.  We do think

13   that there are several of them that really do warrant taking a

14   look at, especially in view of sort of where we are.

15       THE COURT:  Well, we will add that to what Josh is working

16   on and we'll get orders out on those.

17       MR. ROSENTHAL:  Thank you very much.

18       THE COURT:  No.  Thank you.  We should have -- those

19   should get expedited attention, and we'll make sure that Josh

20   does it.

21       MR. ROSENTHAL:  That is all I had, Your Honor.  Thank you

22   very much for your time today.

23       THE COURT:  Thank you for that.

24       Anything else anyone?

25       MR. SIEGMUND:  That's it for plaintiff, Your Honor.

1          THE COURT:  Well, as usual, I shouldn't even get paid for

2     today.  It was an exceptional argument from both sides.  I sure

3     appreciate it.  I look forward to talking to you all week from

4     Friday if not -- if I don't see you sooner.  Have a good day.

5          (Hearing adjourned at 4:19 p.m.)

1  UNITED STATES DISTRICT COURT )

2  WESTERN DISTRICT OF TEXAS    )

3

4      I, Kristie M. Davis, Official Court Reporter for the

5  United States District Court, Western District of Texas, do

6  certify that the foregoing is a correct transcript from the

7  record of proceedings in the above-entitled matter.

8      I certify that the transcript fees and format comply with

9  those prescribed by the Court and Judicial Conference of the

10 United States.

11     Certified to by me this 23rd day of May 2021.

12
                        _/s/ Kristie M. Davis_
13                      KRISTIE M. DAVIS
                        Official Court Reporter
14                      800 Franklin Avenue
                        Waco, Texas 76701
15                      (254) 340-6114
                        kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25